**KEARNEY & TRECKER CORPORA-TION, Plaintiff,**

**v.**

**GIDDINGS & LEWIS, INC., Defendant.**

**Nos. 66–C–360, 67–C–113.**

United States District Court
E. D. Wisconsin.

Nov. 13, 1969.

---

Quarles, Herriott, Clemons, Teschner & Noelke, by Lester S. Clemons, Adrian L. Bateman, Jr., and Thomas W. Ehrmann, Milwaukee Wis., Haight, Hofeldt & Davis, by Edward A. Haight, Chicago, Ill., for plaintiff:

Foley, Sammond & Lardner, by Marvin E. Klitsner, Milwaukee, Wis., Wolfe, Hubbard, Voit & Osann, by Richard R. Wolfe, Edward W. Osann, Jr., Homer J. Schneider, Chicago, Ill., of counsel, for defendant.

OPINION

MYRON L. GORDON, District Judge.

These are consolidated actions. A patent infringement on the part of Giddings & Lewis, Inc. is charged by Kearney & Trecker Corporation. The latter is the owner of Brainard et al. patent Re.–Re. 25,737. Kearney & Trecker seeks injunctive relief and damages for the claimed infringement.

Giddings & Lewis asks for a declaratory judgment asserting that the aforesaid patent is invalid and not infringed; it also has advanced a number of affirmative defenses to bar the enforcement of the patent.

In a comprehensive pretrial report, the parties have stipulated to a large number (135) of uncontested factual matters. They have agreed that for purposes of this consolidated trial Kearney & Trecker Corporation is to be denominated the "plaintiff", and Giddings & Lewis referred to as the "defendant".

The patent in suit (Re.–Re. 25,737) is the second reissue of an earlier patent (3,052,011) which was issued on September 4, 1962. The first reissue (Re. 25,583) was on May 26, 1964, and the re-reissue (Re.–Re. 25,737) was on March 2, 1965.

In the present action, the plaintiff relies on claims 15, 19 and 20 of its patent. The defendant has manufactured certain machines which the plaintiff contends infringe its patent. The following three machines made by the defendant are said to infringe the patent with particular reference to claim 15: NumeriCenter 10V, 15V, and 15V floor type. The plaintiff also charges that the defendant's machine NumeriCenter 25H infringes with reference to claims 19 and 20.

I. VALIDITY

■ Without reference to the allegations as to fraud in the procurement of the patent (which will be discussed later in this opinion), the court will first consider the question of the validity of the patent in suit.

The Brainard patent relates to a machine tool with an automatic tool changing device, the function of which is to select a given tool from a storage bin,

remove it from said bin, transfer it to the machine tool's operating station, remove the previously used tool from the operating station and deliver it to the storage bin. This entire operation is performed automatically, utilizing directions contained on a prepared tape. The directions contained on the tape are executed through an electronic control system and without the intervention of a machine operator.

The plaintiff asserts that there is a major contribution to the machine tool art that is contained in the patent in suit in that it utilizes a two-handed tool changer. Under this technique, the device delivers one tool to the spindle, which presents it to the operating station, while simultaneously restoring a removed tool to the place of storage. The use of the two-handed changing device is said to increase the speed of the operation, and the plaintiff urges that there is invention in such technique.

The defendant contends that the plaintiff's patent is invalid in light of the prior art, 35 U.S.C. § 103, and that it lacks novelty under 35 U.S.C. § 102. Applying the test found in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the defendant seeks a ruling that the plaintiff's patent wants validity by reason of obviousness.

■ In Cloud v. Standard Packaging Corp., 376 F.2d 384 (7th Cir. 1967), the court discussed the analytical steps which must be taken to determine the question of validity under § 103. In resolving the question of obviousness, the court is to examine the scope and content of the prior art, the differences between the prior art and the claims in issue, and, finally, the level of ordinary skill in the pertinent art. Some recent decisions which have examined this test are Skil Corporation v. Cutler-Hammer, Inc., 412 F.2d 821 (7th Cir. 1969); Appleton Electric Co. v. Efengee Electrical Supply Co., 412 F.2d 579 (7th Cir. 1969); Paper Converting Machine Co. v. FMC Corporation, 409 F.2d 344 (7th Cir. 1969); Leach v. Rockwood & Co., 404 F.2d 652 (7th Cir. 1968).

The principal prior art which was considered by the patent office before its allowance of the original Brainard patent is the Morgan patent, No. 2,901,927. While the Morgan patent provided for automatic tool changing, I believe that there are significant distinctions between the Morgan disclosure and claims 15, 19 and 20 of the Brainard patent. For example, contrary to claim 19 of the Brainard patent, the Morgan patent did not have "a tool change arm rotably carried by said frame and operable when rotated to replace a tool in said tool securing means with the selected tool from said storage means." Distinctions between Morgan and Brainard were recognized by both the plaintiff's expert, Dr. Harrington, and the defendant's expert, Dr. Bollinger.

Although the patent office had before it the Morgan patent, the defendant urges that it failed to consider all the relevant prior art. Paragraph 107 of the revised pretrial report recites a number of prior art references asserted by the defendant. Particular reliance is made upon Conradson (2,323,010), Hautau (2,919,010), and the Martonair *Machinery* article. Failure of the patent office to have considered such prior art is stressed by the defendant to support its contention that the statutory presumption of the validity of a patent is inapplicable.

■ The statutory presumption of validity under 35 U.S.C. § 282 "is only overcome by clear and cogent evidence of invalidity." Ortman v. Maass, 391 F.2d 677, 681 (7th Cir. 1968). In the recent case of Deep Welding, Inc. v. Sciaky Bros., Inc., 417 F.2d 1227 (7th Cir. August 13, 1969), Judge Kerner pointed out that

"* * * The presumption of validity is largely, if not wholly, dissipated when pertinent prior art is shown not to have been considered during the processing of the patent application."

The Conradson patent discloses a lathe with a tool carrier from which an operator can visually select and manually withdraw for use and manually return various tools. The Conradson structure shows no "selection means" as called for in claims 19 and 20 and in my opinion differs from the novelty found in the Brainard patent under claims 15, 19 and 20.

The Hautau patent relates to a machine tool which has a "tool securing and operating means". The Hautau patent shows a device in which arms pivot about a common center, exchanging work pieces sequentially. It does not, however, provide selection means for tools. It is my conclusion that the disclosure in the Hautau invention is not identical with claims 15, 19 and 20 of Brainard.

In the Martonair *Machinery* article, there is disclosure of a lathe having means to alternate between two tools; one slides into working position on one side and is removed on the other side. The Martonair device does not have "a control system operably connected", nor does it provide "a plurality of tools removably carried by said tool storage magazine". In my opinion, the alternating two-tool structure of Martonair did not anticipate Brainard, nor did the patent office's failure to consider it impinge on the presumption of the validity of Brainard.

I find that the Brainard invention meets the novelty test of § 102, as well as the nonobviousness test of § 103. The references relied upon by the defendant do not anticipate the patent under § 102, nor do they negate patentability under § 103.

With regard to the "ordinary skill in the art", the defendant urges that the Brainard patent is invalid, notwithstanding any novelty it may possess, because the novel departures do not meet the nonobviousness test with respect to the body of prior art as a whole. The record in this case persuades me that the combinations of claims 15, 19 and 20 would not have been obvious to one of ordinary skill in the art. Mr. Sedgwick testified that the control system was an obvious control expedient. From this, the defendant urges that element f of claim 15 was obvious to one of ordinary skill in the art. Mr. Sedgwick also opined that there would be no great difficulty in adapting the Hautau transfer arm for tool transfers.

I was not impressed with the correctness of Mr Sedgwick's views and do not regard them as persuasive proof that the combination of claims 15, 19 and 20 were obvious to a person of ordinary skill in the art. Like Mr. Sedgwick, Mr. Hautau is an inventor. Notwithstanding the latter's extensive experience in the design of automatic machines, the prior art did not make obvious to Mr. Hautau the structure of the claims in suit.

In 1956, Ford Motor Company solicited builders of machine tools to submit proposals on a numerically controlled machine tool with automatic tool changing. It would appear that the combination of claims 15, 19 and 20 as found in the Brainard patent were not sufficiently obvious to evoke an effective response to the Ford invitation to the trade. Thus, although there was a need and a demand for an efficient automatic tool changing machine tool, and although the industry was familiar with the Morgan machine, it was not until the Brainard patent that the combination of elements contained therein was put together and recognized by the trade.

The commercial success of the Milwaukee-Matic II machine tool has been stipulated to by the parties; this tends to support the view that this patent achieved the result of commercial success in part by reason of its novelty. However, the defendant points out that under Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the question of commercial success is a "secondary consideration". Defendant also urges that commercial success, in order to have legal consequence,

must be shown to have been attributable to the claimed invention and not to such extraneous factors as extensive advertising. Schreyer v. Chicago Motocoil Corp., 118 F.2d 852, 857 (7th Cir. 1941).

It is my conclusion that the commercial success of the Milwaukee-Matic machine is fairly attributable in part to the claims in suit. Although it is indeed a secondary consideration, it tends to support my conclusion as to the nonobviousness of the Brainard patent.

The defendant contends that the claims in suit are indefinite, and thus do not satisfy the requirements of 35 U.S.C. § 112. Although the defendant's expert, Dr. Bollinger, found several aspects of vagueness in the several claims, I find that the defense of vagueness is not established. See Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467, 476 (9th Cir. 1962).

## II. INFRINGEMENT

■ The plaintiff argues that the defendant's machines infringe claims 15, 19 and 20 of its patent. Specifically, it is urged that claim 15 is infringed by the 15V machine of the defendant, and claims 19 and 20 are infringed by its 25H machine. The burden of proving infringement is on the plaintiff. Becker v. Webcor, Inc., 289 F.2d 357, 360 (7th Cir. 1961).

The defendant contends that in order to obtain its patent, the plaintiff narrowly defined its invention and should not now be permitted to expand such definition in order to establish infringement. A comparable point was made in Fife Mfg. Co. v. Stanford Engineering Co., 299 F.2d 223, 226 (7th Cir. 1962), where the court said:

"It is well settled that a patent owner may not apply a narrow construction to his claim to avoid the prior art and then apply a broad construction to include an accused device."

The question of a "narrow interpretation" of the patent claims was considered in International Banding Machine Co. v. American Bander Co., Inc., 9 F.2d 606, 608 (2d Cir. 1925), where the court said:

"It is the duty of the court to read a claim in the light of the entire disclosure of the patent as a whole. It will interpret an expression positively recited in the claim as satisfied by any suitable instrumentality capable of performing the stated function successfully, unless, by so doing, violence to some other patent may be committed. It should never interpret a positively recited generic expression as limited to the precise instrumentality disclosed by the patent, except where such narrow interpretation is necessary to distinguish the claim from the prior art."

■ An invention is protected against infringement by the breadth of its claim language, rather than by the specific structure shown in the specifications. King-Seeley Thermos Co. v. Tastee Freez Industries, Inc., 357 F.2d 875, 880 (7th Cir. 1966); Nordberg Manufacturing Co. v. Woolery Machine Co., 79 F.2d 685, 692 (7th Cir. 1935). Thus, it is the claims which define the invention; nevertheless, a specification may be used to explain an ambiguity in the claims. Minnesota Mining and Manufacturing Co. v. Technical Tape Corp., 309 F.2d 55 (7th Cir. 1962); Scherbatskoy v. United States Steel Corp., 287 F.2d 552 (7th Cir. 1961).

In denying infringement, the defendant contends that it is tool coding which makes possible the interchange of the old and the new tools under the plaintiff's patent. Defendant points out that the accused machines use uncoded tools, which cannot be located unless they have been placed in a correct station. I do not believe this distinction is controlling; I believe that claims 15, 19 and 20 of the patent in suit are broad enough to include other forms of sensing tool location than the use of coded tools. The language of the claims does not restrict the Brainard invention to functioning with coded tools. Thus, I believe that

the defendant errs in asserting that "tool coding and tool coding alone" makes it work.

The court must further determine whether claim 15 of the patent in suit is infringed by the 15V machine of the defendant. Although the vertical spindle machine is capable of single matrix operation, the record establishes that the machine is intended to be operated by taking tools alternately from both matrices. The fact that the defendant's model 15V may be operated in a noninfringing manner does not resolve the issue of infringement if it can be found that the device also operates in an infringing manner. Wright Co. v. Herring-Curtiss Co., 211 F. 654, 655 (2d Cir. 1914).

The 15V machine has two matrices which are rotated so as to bring pre-selected tools into the tool change position. Just as in the patent in suit, the two matrices play a similar role of housing the tools that are awaiting use and rotating them into position. The plaintiff's expert, Dr. Harrington, opined that the dual matrices function as a single magazine, and that in this regard, claim 15 applies to the 15V machine.

The defendant urges that the model 15V does not have a control system as set forth in claim 15. The defendant's expert focused his testimony upon that portion of claim 15 which provides: "while the machine tool is operating with a different tool at the operating station". The defendant maintains that the plaintiff's interpretation unduly broadens the provisions of claim 15. I believe that the narrow reading of claim 15, as urged by the defendant, is unwarranted and that the 15V machine cannot thereby be relieved of the charge of infringement. I find that the defendant's model 15V infringes the plaintiff's patent.

The plaintiff also contends that claim 19 of the patent in suit is infringed by the defendant's model 25H. I find that the plaintiff has met its burden in establishing this infringement.

The defendant's principal contention in this regard relates to the operation of the tool change arm. In the defendant's model 25H, the spindle moves to engage the tool and then withdraws, with the spindle coming to the arm, rather than the arm going to the spindle. While both the Milwaukee-Matic II and the accused machine utilize a tool change arm to change tools, the defendant urges that there is a significant variance since in the latter machine, the spindle moves with the tool toward the tool grip, which grasps the tool and then the spindle withdraws; in the plaintiff's machine, no spindle motion is required for that part of the transfer from the matrix to the spindle. I reject the defendant's distinction. I also conclude that the defendant's model 25H has a "selection means operative to select a desired tool in said tool storage means" for placement in the bin as stated in claim 19.

I am not persuaded that there is any estoppel adverse to the plaintiff to be found in the first reissue file wrapper.

The plaintiff also contends that claim 20 is infringed by the 25H machine. The court must determine whether there is a meaningful distinction because the tool ready station in the defendant's 25H machine is located at the rear thereof in the magazine, rather than at the front. The words "tool change station" found in claim 20 refer to the station at which the tool is gripped by the rotatable arm and transferred to the spindle. The function of the tool change arm remains the same whether it is located at the front or the rear.

In my opinion, claim 20 is infringed by defendant's model 25H.

### III. THE DEFENSE OF UNCLEAN HANDS

*Giddings & Lewis* contends that the patent in suit is unenforceable by reason of the plaintiff's alleged wrongful conduct in its relationship to the U. S. patent office. The evidence on this subject was extensively presented at the trial, and the matter has been covered

copiously in the submissions of counsel after trial. It is apparent that the defendant relies heavily on the defense of unenforceability based on the plaintiff's alleged misconduct vis a vis the patent office. I have concluded that such misconduct as is chargeable to the plaintiff does not warrant the court's rendering the patent in suit unenforceable. In reaching such conclusion, I have considered exhibits 561 and 561A which were filed with the court after the end of the trial. I will now discuss the factual and legal considerations which have resulted in the aforesaid conclusion.

The defendant claims that the Kearney & Trecker patent application received favored treatment at the hands of the patent office examiners by reason of "hospitality" which was afforded to the patent office examiners by officials of Kearney & Trecker. While the patent application was pending, Mr. Beall and Mr. Eanes, examiners of the patent office, visited the plaintiff's plant for two days. On one evening during their visit, the two patent office representatives attended a birthday party for Mr. Trecker at his home. The next evening, they had dinner with the plaintiff's patent attorneys, Messrs. Wutschel and Hajewski. Mr. Eanes later invited Mr. Trecker to dine at the Eanes' home in Washington, D.C., and Mr. Trecker accepted that invitation. Mr. Eanes also entertained Mr. Wutschel and Mr. Hajewski at his home. Mr. Wutschel attended a retirement party given for Mr. Beall on June 24, 1962.

In my opinion, the existence of these personal relationships does not justify the defendant's conclusion that such associations tainted the patent or resulted in discriminatory treatment in favor of the plaintiff.

The court notes that Mr. Beall and Mr. Eanes had also inspected the Giddings & Lewis plant at Fond du Lac just before coming to Milwaukee to visit the plaintiff's facilities. The two examiners, Mr. Beall and Mr. Eanes, were the dinner guests of Mr. Kraut and other officers of Giddings & Lewis. It was stipulated by counsel in the pretrial report that

"During the course of dinner, mention was made of fishing trips to Canada which Giddings & Lewis had in the past arranged for its executives and guests. A tentative invitation was made to the examiners, Beall and Eanes, for them to join Giddings & Lewis people on a fishing trip to Canada during the summer of 1961."

From the foregoing, it is apparent that the defendant is in no position to criticize the plaintiff for rendering hospitality to the two visiting examiners. In any event, it does not appear that this social activity was illegal or that it resulted in favored treatment to the plaintiff in connection with its application before the patent office. The defendant has not met its burden of establishing that this conduct was inequitable, fraudulent, or tainted the plaintiff with unclean hands.

In further support of its contention that Kearney & Trecker subverted personnel of the patent office, the defendant points to a number of interviews between Kearney & Trecker representatives and patent office examiners. Defendant argues that there were an excessive number of such personal interviews, and that several of them were not made of record in the official files. The defendant points to patent office rule 133(b), which requires

"In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant."

Mr. Hajewski interviewed Mr. Eanes at the patent office during the week of January 15, 1961 in connection with the Brainard tool changer application and discussed with Mr. Eanes the subject of initiating an interference proceeding in regard to the Morgan patent which was then owned by IBM. However, no

record of this interview nor its subject matter appears in the Brainard file wrapper. Similarly, no record was made of interviews held on May 31 and June 1, 1961 in which Mr. Wutschel and Mr. Hajewski again interviewed Mr. Eanes. The same two representatives of the plaintiff also conducted interviews on September 27, 28 and 29, 1961 with Mr. Eanes and Mr. Beall at the patent office and again discussed the matter of possible interference with the Morgan patent in connection with the Brainard application. Mr. Eanes was also interviewed on January 22, 1962. A number of documents were introduced into evidence which showed that the plaintiff's attorneys kept memoranda concerning these interviews in their own patent department files.

The defendant makes a number of charges concerning these interviews which, in my opinion, are not justified by the record. For example, the contention that the number of such interviews was "excessive" is not supported by any reference to any rule of the patent office or by any other legal authority. The record simply does not disclose any inherent irregularity in the number of such interviews.

Similarly, the failure to record such interviews is not in itself a violation of patent office rule 133(b); that rule applies when reconsideration is requested, and in such case a written statement of the reasons presented must be filed. The interview during the week of January 15, 1961 related to the possible interference which was never declared; it did not constitute a request for reconsideration. The interviews on May 31 and June 1, 1961, also concerned a possible interference and changes to be made in the drawings and in the written description; such interviews may not be deemed requests for reconsideration.

The interviews on September 27, 28 and 29, 1961 concerned the same possible interference, as well as the discussion of proposed new application claims which were added by an amendment subsequently filed, and the amendment did in fact discuss the reasons why such claims were allowable. With reference to the interview on January 22, 1962, an amendment was filed on March 30, 1962 following such interview, which set forth the reasons why certain claims rejected by the examiner should be reconsidered and the reasons why certain new claims should be allowed.

The record shows that when an interview was held relating to the submission of a new claim, it was filed in the file wrapper with the reasons advanced for its allowability. Thus, new claims 50 to 61 were added by an amendment of December 16, 1959; new claims 62 to 72 were added by an amendment of October 16, 1961; and, new claims 73 to 80 were added by an amendment of March 30, 1962. In each instance, the reasons for allowability were incorporated in the amendment.

Giddings & Lewis also charges that during personal interviews with Mr. Eanes, the plaintiff improperly succeeded in minimizing the impact of the Morgan patent as a reference against the Brainard patent. In its brief, the defendant charges that Mr. Eanes "was encouraged to withhold action under assurances that plaintiff had a basis for proving invention dates prior to Morgan * * *" These charges are not, in my opinion, well founded. The Morgan patent was consistently cited and applied by the examiner as a prior art reference from a time previous to any of the interviews to which the defendant alludes; the shadow of the Morgan patent was present throughout the entire prosecution of the application for the original Brainard patent.

It is charged that the plaintiff engaged in an irregularity with the patent office in obtaining from it "in the guise of resolving the interference issue" an advisory opinion that the Morgan patent was infringed by the Milwaukee-Matic II machine. The defendant goes on to assert that utilizing this advisory opinion, Kearney & Trecker engaged in negotiations with IBM to acquire the Morgan patent without revealing the patent

office position. While it is true that Kearney & Trecker considered means of having the Morgan patent removed as a reference, it does not follow that consideration of such possibility was a tainted transaction or resulted in discriminatory treatment in favor of Kearney & Trecker. In addition, the commencement of the negotiations with IBM relative to the Morgan patent antedated the patent office interviews in question.

Preferential treatment is also attributed to the plaintiff "in obtaining Examiner Eanes' consent to a misleading inclusion of Hautau patent number 2,711,817 * * * as a reference of record after prosecution was closed * * *." A memorandum reflecting an interview on this matter is before the court as defendant's exhibit number 63. It demonstrates that the patent office had considered the Hautau patent and, thus, the subsequent reference to it may not properly be denominated as a "misleading inclusion".

The court must examine the impact of the plaintiff's disavowal of the reissue claims. The defendant has made an accusation of unclean hands in connection with the plaintiff's conduct in processing the first and second reissue applications. There is a charge of irregularity regarding the hiring of Mr. Beall after his retirement from the patent office and the assignments given him by Kearney & Trecker. The plaintiff has given up claims 36 to 60 and takes the position that the earlier claims, which were a part of the original Brainard patent, were allowed by the patent office before Mr. Beall was employed by Kearney & Trecker. The court must consider the defendant's charges in regard to the reissue claims, but first it should be determined whether, under the law, that matter is moot by reason of the plaintiff's express waiver of any rights under such reissue claims.

The defendant points to the case of Staude v. Bendix Products Corp., 26 F. Supp. 901 (N.D.Ind.1939); that case suggests that where a reissue is tainted with fraud "a claim even though

brought forward from the original patent goes out with the reissue." The plaintiff relies on a number of other cases which reach an opposite conclusion and permit the claims of the original patent to be enforced even though there is unenforceability in connection with the reissue claims. For example, in Cleveland Trust Co. v. Thomas, 1 F. Supp. 917, 920 (D.Mass.1932), the court said:

> "It is settled law that the invalidity of a new claim in a reissue does not impair the validity of original claims repeated in the reissue patent."

Similarly, in Foxboro Co. v. Taylor Instrument Companies, 157 F.2d 226, 228 (2d Cir. 1946), Judge Learned Hand stated that

> "* * * the surrender of the original patent, resulting from the acceptance of the reissue, did not invalidate any claims which he carried over into the reissue."

In Budd Wheel Co. v. General Motors Corp., 16 F.Supp. 115, 116 (D.Del.1936), the court said that delay in applying for the reissue patent invalidated only the new reissue claims and "has no effect whatever on the claims carried over into the reissue identical in form with those in the original patent". See also Well Surveys, Inc. v. McCullough Tool Co., 199 F.Supp. 374, 387 (N.D.Okl.1961); Rothholz v. Kreger, 89 F.Supp. 231, 233 (D.Conn.1950); Schenk v. United Aircraft Corp., 43 F.Supp. 679 (D.Conn. 1941).

It is my conclusion that by reason of the plaintiff's formal abandonment of the reissue claims, any illegality in connection with the prosecution of the reissue applications does not, as a matter of law, make the original patent invalid. Nevertheless, since the issue of unclean hands is an equitable matter, I think it is appropriate that the court consider the irregularities charged in connection with the processing of the two reissue patents. Notwithstanding the effective and formal relinquishment of any rights under the reissue patents,

proof of wrongdoing in the prosecution of those applications could have a bearing upon the court's application of the doctrine of unclean hands as it concerns the enforceability of the claims in suit.

Mr. Beall voluntarily retired from the patent office on June 22, 1962. A few days later, on June 25, 1962, Mr. Wutschel met with Mr. Beall and explored the possibility of retaining him as a patent consultant for Kearney & Trecker, but Mr. Beall stated that he was not interested. About two weeks later, Mr. Trecker talked with Mr. Wutschel and several other officials of Kearney & Trecker about employing Mr. Beall. On July 12, 1962, Mr. Trecker conferred with Mr. Beall at the latter's home concerning employment, and on August 1, 1962, Mr. Beall signed an agreement in which he contracted to perform consulting and advisory services for Kearney & Trecker about two days per week. Pursuant to this employment, Mr. Beall advised his employer on methods of securing additional patent protection for the subject matter already disclosed in the Brainard patent. He aided and assisted Kearney & Trecker in the preparation and prosecution of both the first and the second reissue applications.

More specifically, at the instance of the plaintiff, Mr. Beall prepared an evaluation of the scope of the original Brainard patent. He reviewed the proposed claims which were to be incorporated in the reissue application and prepared additional claims. On July 31, 1963, he met with other Kearney & Trecker officials to discuss possible reissue of the Brainard patent. On December 14, 1963, Mr. Beall wrote to Mr. Wutschel as follows:

"Incidentally, it would be helpful to me if my reports were temporarily removed from the file if and when the file is used at the Patent Office. Our friend might note the reports with great glee and attempt to inform a possible evasion of the two year rule. You probably removed them anyway. Further I do not see that any real evasion has been done and do not con-

template filing for register as a patent attorney anyway."

It is clear that the words "our friend", appearing in the above quoted paragraph, refer to Mr. Eanes.

On March 30, 1964, Mr. Beall wrote to Mr. Wutschel as follows:

"I called Eanes and he is sending the Brainard reissue to issue and will look forward to the citation of the new reference material. He seems to think that K & T should make a motion in some of the interferences to the effect that the count is unpatentable."

In connection with the second reissue application, Mr. Beall wrote a letter to Mr. Hajewski, dated October 30, 1964, offering "to take the amendment to him [Mr. Eanes] to find his reactions and pursue the matter to higher levels if adverse." Mr. Beall interviewed Mr. Eanes at the patent office on December 4 and December 7, 1964 with regard to the entry of an amendment and had lunch with him on both days. Mr. Eanes telephoned Mr. Beall on the evening of December 4, and Mr. Beall telephoned Mr. Eanes on December 9, 1964. Mr. Eanes informed Mr. Beall that the latter had neither a power of attorney in the case, nor the right to conduct prosecution before the patent office because he was not registered to do so. However, the amendment filed December 4, 1964 was finally entered by Mr. Eanes. Mr. Beall reported to Mr. Wutschel about his interviews with Mr. Eanes in a letter dated December 16, 1964.

While there was no illegality in hiring Mr. Beall on the termination of his employment in the patent office, it was improper for Mr. Beall to assist in the first reissue application less than two years after he left the patent office. In my opinion, the performance of this service was contrary to the patent office policy as reflected in patent office rule 341. The plaintiff argues that the nature of Mr. Beall's services was not dictated by its executive officers, but it is my conclusion that Kearney & Trecker is chargeable with Mr. Beall's actions.

Insofar as they were done at the direction of the attorneys in the Kearney & Trecker patent department, they are properly ascribed to the plaintiff.

Notwithstanding Mr. Beall's participation in the prosecution of the reissue applications, I believe that the nature and degree of such questionable conduct is not adequate to render the patent unenforceable in equity. The target of Mr. Beall's activity, Mr. Eanes, was mindful of Mr. Beall's employment by Kearney & Trecker immediately after the hiring. Mr. Eanes recognized that Mr. Beall had neither a power of attorney in the case, nor the right to conduct proceedings before the patent office because of his failure to register. The irregularity involved in Mr. Beall's participation did not, in my opinion, give the plaintiff significant benefits it would not have otherwise received. Mr. Beall's activities as an employee of Kearney & Trecker could have had no effect on the original patent or the claims in suit, and his demeanor was not such as to warrant the court's refusal to enforce the basic patent.

The defendant points to the subsequent discharge by Kearney & Trecker of both Mr. Beall and Mr. Wutschel and suggests that the plaintiff reaped the benefits of their improper conduct and then belatedly discharged them. On the other hand, the discharges may be construed as demonstrating that the company did not condone the actions of Mr. Beall and Mr. Wutschel. Although chargeable with the conduct in question, Kearney & Trecker took appropriate steps in making a disclosure to the patent office and in abandoning the patent claims which may have benefited from Mr. Beall's activities. See Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

Before a court finds a patent unenforceable by reason of unclean hands, it should be satisfied that there is clear and convincing evidence of unconscionable or morally reprehensible conduct which was material in the procurement of the patent. Aerosol Research Co. v. Scovill Mfg. Co., 334 F.2d 751, 756 (7th Cir. 1964); Armour & Co. v. Wilson & Co., 274 F.2d 143, 148 (7th Cir. 1960); Waterman-Bic Pen Corp. v. W. A. Sheaffer Pen Co., 267 F.Supp. 849, 856 (D.Del.1967); Tractor Supply Co. v. Int'l Harvester Co., 155 USPQ 420, 433 (N.D.Ill.1967). In my opinion, the extent of misconduct contemplated in the foregoing cases is not present in the case at bar.

An additional charge of misrepresentation is attributed to the plaintiff in connection with its representations to the patent office concerning prior art. In connection with the original patent application, the plaintiff filed an amendment on November 21, 1960 which stated:

"The applicants here have proved an entirely new concept in an automatic machine tool. To the best of applicants' knowledge, it is the first practical milling machine in which the tools may be automatically changed in the spindle. It will be noted that the Morgan patent and any other prior art in this field all relate to drilling machines."

The defendant contends that the distinction between the Brainard claims as opposed to the Morgan claims asserted in the foregoing paragraph is "flagrantly misleading" and is a "flagrant misstatement". In his testimony, Mr. Trecker agreed that this distinction was not meaningful. The distinction was never subsequently urged or repeated and, in my opinion, does not even qualify as an act of misrepresentation; I believe it to have been nothing more than an error, and an unimportant one at that.

The claim is also made by the defendant that the plaintiff made a misleading statement regarding the operation of the Morgan machine in an amendment filed March 30, 1962. The plaintiff is charged with making a spurious distinction in its assertion that in Morgan "the magazine is indexed for selecting the de-

sired tool while it is remote from the machine". Even if the purported distinction is erroneous, the evidence does not persuade me that any claim distinction turned on this question, and, accordingly, I conclude that there was no meaningful misrepresentation involved.

The defendant also maintains that Kearney & Trecker sought to mislead Mr. Eanes with regard to the priority of invention as between the Morgan and Brainard patents, suggesting that there was an overlap between the two patents. The plaintiff considered submitting an affidavit which would show the priority of the Brainard patent; but no such affidavit was filed; on the contrary, Kearney & Trecker conceded the priority of the Morgan patent. Thus, the plaintiff acknowledged the priority of Morgan, and the patent office treated Morgan as prior art. Under such circumstances, it cannot be said that there were any misleading acts on the part of Kearney & Trecker.

## IV. ANTI-TRUST VIOLATIONS

■ In addition to its claim that the patent was improperly procured, the defendant also urges that the plaintiff has unlawfully attempted to monopolize the relevant market in violation of the anti-trust laws.

The defendant points to the plaintiff's acquisition of the Morgan patent from IBM as an event which permitted the plaintiff to engage in a monopoly. The Morgan patent was issued on September 1, 1959, following IBM's application for the patent in December, 1957. On March 21, 1960, Kearney & Trecker inquired about obtaining a license under the Morgan patent. Negotiations followed during which IBM charged Kearney & Trecker's Milwaukee-Matic machine with infringement of the Morgan patent. The negotiations terminated on April 22, 1963, when an agreement was reached for the sale of the Morgan patent to Kearney & Trecker. Giddings & Lewis had been licensed by IBM under the Morgan patent, and a share of the royalties paid by Giddings & Lewis aft-

er the plaintiff's acquisition of the Morgan patent were collected by Kearney & Trecker.

The sale by IBM of the Morgan patent to Kearney & Trecker carried with it an express provision requiring Kearney & Trecker to license all applicants, and further expressly provided that the rate charged in such licensing not exceed .4% of the selling price. IBM retained the right to grant licenses in the event Kearney & Trecker failed to comply with such provisions. There is no evidence in this record which would support a finding that Kearney & Trecker has ever refused to grant a license to anyone who ever applied, nor has it required as a condition to taking such a license that the licensee take a license under any other patent.

The defendant charges that there has been a tie-in policy on the part of the plaintiff in which the plaintiff charged a package royalty regardless of whether the licensee utilized the invention of the other patents. In my opinion, upon the record in this case, Kearney & Trecker may not be found to have practiced an improper tie-in policy. The conduct of the plaintiff in this case is quite unlike that described in McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 408 (10th Cir. 1965), where the court said:

> "It is true that a patentee unlawfully uses a patent monopoly when, for a fixed royalty, he refuses to grant a license under one or more of his patents unless a license is taken under all of his patents. * * * However, in order to constitute a misuse, there must be an element of coercion, such as where there has been a request by a prospective licensee for a license under less than all of the patents and a refusal by the licensor to grant such a license."

Two decisions of the court of appeals for the seventh circuit which consider compulsory package licensing are Shea v. Blaw-Knox Co., 388 F.2d 761 (7th Cir. 1968) and Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252, 259 (7th Cir. 1960), cert. den. 366 U.S. 211,

81 S.Ct. 1091, 6 L.Ed.2d 239 (1961). The defendant has not established its contention that the plaintiff has utilized its Morgan patent in such manner as to offend the anti-trust laws.

Another argument by the defendant in regard to anti-trust concerns the taking of covenants which prevented licensees from challenging the validity of the patent. Such covenants were considered valid in the past. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); Baker-Cammack Hosiery Mills, Inc. v. Davis Co., 181 F.2d 550, 569 (4th Cir. 1950). However, on June 16, 1969, the United States supreme court rendered its decision in Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In *Lear*, the court concluded that licensees are no longer estopped as a matter of law from questioning the validity of the licensed patent. At the time such provisions were incorporated in the plaintiff's license agreements, there was no illegality, and in my opinion, it does not now supply a basis for retroactively finding an anti-trust violation. Cf. Armstrong v. Motorola, Inc., 374 F.2d 764, 774 (7th Cir. 1967).

A number of other contentions of the defendant relating to price restrictions and tie-ins on the part of the plaintiff have been considered and found to be without merit. I conclude that the plaintiff's acquisition of the Morgan patent and its licensing practices in connection therewith or in connection with its Brainard patent did not violate the anti-trust laws or constitute a misuse of its patents.

## V.  CONCLUSION

I find that the plaintiff's patent is valid and that the defendant has infringed claims 15, 19 and 20 thereof. Although there was questionable conduct chargeable to the plaintiff in relation to the prosecution of the two reissue patents, such actions were not of sufficient gravity to warrant the court's refusal to enforce an otherwise valid patent. The patent is not rendered unenforceable by reason of any alleged violation of the anti-trust laws. Accordingly, Kearney & Trecker is entitled to injunctive relief as well as to damages for the infringement.

Giddings & Lewis has made an application for a declaratory judgment, which must be denied.

The foregoing opinion shall constitute the court's findings of fact and conclusions of law pursuant to rule 52, Federal Rules of Civil Procedure. Plaintiff's counsel is requested to submit an appropriate order for judgment, but such document shall not be submitted to the court for signature until two weeks after first having submitted the same to opposing counsel.