**DOW CORNING CORPORATION, a Michigan corporation, Plaintiff,**

**v.**

**SURGITEK, INCORPORATED, a Wisconsin corporation, and Medical Engineering Corp., a Wisconsin corporation, Defendants.**

No. 71–C–75.

United States District Court,
E. D. Wisconsin.

June 25, 1974.

Paul R. Puerner of Michael, Best & Friedrich, Milwaukee, Wis., Merriam, Marshall, Shapiro & Klose by William A. Marshall and Owen J. Murray, Chicago, Ill., for plaintiff.

Nilles & Barry by Ronald E. Barry, Milwaukee, Wis., and McDougall, Hersh & Scott, by Melvin M. Goldenberg, Chicago, Ill., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

This is a suit by Dow Corning Corporation against the Medical Engineering Corporation and its marketing subsidiary, Surgitek, Inc., for patent infringement of claims 1 through 5 of patent number 3,293,663. That patent, entitled "Surgically Implantable Human Breast Prosthesis", and invented by Dr. Thomas D. Cronin, was issued to the plaintiff on December 27, 1966. The defendants have manufactured and sold the accused device since late in 1970.

The complaint, filed on February 2, 1971, alleged infringement of the Cronin patent and also of patent number 3,257,668. The latter patent is no longer involved; a consent decree was entered holding it valid and infringed.

In their amended answer and counterclaim, the defendants claim that the Cronin patent is not infringed and that it is invalid. In addition, they charge the plaintiff with misuse and unclean hands, based upon fraud on the patent office, as well as violation of the anti-trust laws. The fraud, misuse and anti-trust issues were severed in an order dated September 20, 1973. 61 F.R.D. 578. Evidence was received with respect to the validity and infringement issues alone at a court trial on March 25–27, 1974, and the parties have submitted post-trial briefs.

The defendants contend that the Cronin patent is invalid and that the accused device is non-infringing. First, pointing to a number of "prior art" patents and publications, they urge that the subject matter of the Cronin patent was obvious at the time of filing. 35 U.S.C. § 103. The defendants also charge the plaintiff with having deliberately withheld such information from the patent office.

Secondly, the defendants claim that the Cronin patent is invalid because Dr. Cronin did not himself invent the patented subject matter. 35 U.S.C. § 102(f). That the Cronin patent allegedly failed to disclose the best mode known to Dr. Cronin at the time the application was filed is advanced as the third challenge to its validity. 35 U.S.C. § 112, ¶ 1. Fourthly, the presumption of validity which would otherwise attach to the Cronin patent has been undermined, according to the defendants, to the extent that certain patent office rules of practice were allegedly violated. Rules of Practice of the United States Patent Office, Rule 133(b); 35 U.S.C. § 112. Finally, while insisting that the accused device does not infringe the Cronin patent the defendants suggest that the doctrine of file wrapper estoppel is applicable under the circumstances of this case.

The prosthesis shown in the Cronin patent consists of a two-piece container; it is made of silicone rubber and filled with silicone gel, which is provided with a tissue attaching means on its back. Described in the patent and shown in the drawing is a corrugated piece of dacron mesh fabric cemented in spots to the entire back of the container. The dacron mesh is described as a material through which body tissue can grow in order to anchor the prosthesis to the chest wall after implantation. The patent states that such material should be porous for the purpose indicated, and states also that other "sponge-like material" can be used.

## I. PRIOR ART IMPLANTS

In the 1950's, surgeons began to use synthetic materials for purposes of mammary augmentation, including ivalon, etheron, dicora, polyurethane and silicone rubber, all of which were in the form of open cell sponges. The sponges were supplied in solid block form, carved by the surgeon to the desired shape, and then placed in a pocket formed over the chest wall in the patient. The open cell nature of the sponge materials permitted the entire surface of the implant to be invaded by fibrous body tissue; such tissue would grow into or through the sponge cell structure and become interwoven with the sponge, thereby increasing the amount of scar tissue formation.

The record indicates that the long term results of such grafts proved unsatisfactory to the extent that the implants, invaded by scar tissue, shrunk and became hard, sometimes rock-like; asymmetry also occurred.

Prior to 1961, several preformed prostheses were designed to obviate the shrinkage problem by limiting the depth of the tissue penetration. These devices were known as compound prostheses, having an inner core to provide the desired softness and a separate outer envelope of tissue permeable material functioning as the tissue anchoring means.

The Pangman patent, number 2,842,775, which issued July 15, 1958, together with the Edwards prosthesis, which was first made in 1959 by Dr. Ben Edwards, are representative compound prostheses. Each reduced the amount of the scar tissue invasion; but with time, the record shows that the tissue intrusion of the outer sponge cover produced the same type of shrinkage and hardening problems that had previously existed with the carved sponge blocks.

Dr. Edwards indicated that the reason why the entire surface of his prosthesis was covered with sponge-like, tissue permeable material was so that there would be "no unsatisfied tissue" which might cause an unnatural response in the body. He acknowledged his reluctance, until 1964, to use the Cronin prosthesis; the primary feature of that device is its limited use of a tissue fixation means. Indeed, the record indicates that at the time that the Cronin patent was issued, it had long been accepted by the medical profession that, as Dr. Edwards stated, mammary prostheses had to have a tissue anchoring means around their entire periphery in order to satisfy the surrounding body tissues.

Dr. Cronin's approach was contrary to this concept. He did not want the entire prosthesis firmly attached to tissue. Rather, he wanted his device to have only a limited amount of material on the back to anchor it to the chest wall; the rest of the prosthesis was to move freely.

## II. VALIDITY

### A. Obviousness

The defendants' defense of obviousness is founded upon 24 patents and publications. Of the 12 patents relied upon by the defendants, five were cited by the patent office in the prosecution of the Cronin patent and another is set out in the Cronin specifications. In the court's opinion, the other patents are no more pertinent than the art which was before the patent office; the publications are even less relevant than the patents.

The Nelson patent number 3,020,260 is cited in the specifications of the patent. Of the five patents cited by the patent office, four relate to external or bra-type prostheses which are not implantable. These breast shaped forms include the Heuchan patent number 1,250,875; the Bernhardt patent number 2,542,619; the Freedman patent number 2,636,182; and, the Kausch patent number 2,543,499. Hollow and filled only with air, or containing at least a section having air, these devices are not implantable in the human body; they have some fabric on the back, but it is merely a flat fabric designed to shield the wearer from the generally toxic, rubbery material of the prostheses.

The Bernhardt patent suggests a number of different types of fillers, including the use of a "conformable gel." The record indicates that the materials suggested, i. e. "bouncing putty" and a combination of starch· and water, are not true gels; they are not gels in the sense referred to in the Cronin patent.

The Pangman patent, which concerns a compound prosthesis discussed above, was the only one involving an implantable prosthesis which was cited by the patent office. No suggestion is made in the Pangman patent to eliminate that prosthesis' sponge cover or to fill that prosthesis with a gel as disclosed by the Cronin patent.

The six other prior art patents cited by the defendants are even less pertinent, in my opinion, than those cited by the patent office. Three of them, the Edwards patent number 3,113,586, the Segger patent number 3,197,788, and the Edwards patent number 3,099,016, all relate to complicated heart valves whose structures in no way resemble a mammary prosthesis. While they discuss the use of material to allow tissue ingrowth, each of the devices has to be sutured into place. Suturing is not desirable with mammary prostheses, however, because it requires a larger incision in the patient.

A fourth patent which is cited by the defendants as prior art is the Pangman patent number 3,189,291; it represents a variation of the earlier Pangman patent number 2,842,775, which was cited by the patent office against the Cronin patent. The Pangman '291 patent discusses the shrinkage and hardening problems encountered in the prior art, including the earlier Pangman patent. Retained in this newer patent, however, is the same basic design of a compound prosthesis having fixation means over its entire surface. Its proposed improvements lie in the use of an inner sponge structure which can be removed if it is desired to enlarge or harden the implant; thus, a surgeon can reoperate, remove the core, and replace it. I believe that the Pangman '291 patent is no more pertinent to the Cronin patent than its parent patent.

Fifthly, the defendants cite the Gillet patent, French number 1,085,676, which describes a synthetic sponge placed in a polyethylene envelope. The envelope has a flange so that when the device is implanted it can be sutured into place. However, it was demonstrated on the record that polyethylene gives poor results and that suturing requires an undesirably large incision.

The sixth and last in the line of prior art patents which have been advanced by the defendants is the Kausch patent number 3,067,431. Like its predecessor, the Kausch patent which was cited against the Cronin patent by the patent office, it is an external or bra-type prosthesis and is not implantable.

The twelve publications advanced by the defendants with respect to their charge of obviousness either have little to do with mammary prostheses or tend to support the testimony presented by the plaintiff as to the deficiencies of the prior art.

The Pangman, the Edwards, and the Freeman articles, which were identified at trial as defendants' exhibits 14.1, 14.-11 and 14.9, all deal with deficiencies of the prior art. Dr. Edwards' testimony at trial updated his article, identified at trial as plaintiff's exhibit 11. He said he abandoned his compound prosthesis,

described earlier, because it did not work and that he has used the Cronin prosthesis ever since.

The Harrison, the Kay and the two Starr articles, which were identified at trial as defendants' exhibits 14.4, 14.10, 14.5 and 14.7, are involved with heart devices, not mammary prostheses. The Harris survey, defendants' exhibit 14.6, discloses no prosthesis design, material or method of implant. The Wolstenholme paper, defendants' exhibit 14.2, describes tissue reaction to implanted dacron fabric used for hernia repair. No reference is made to mammary prostheses.

The "Esophageal Replacement With Prosthesis" article by Lyons, Beck and Lester, identified as defendants' exhibit 14.12, deals with experimental work on dogs. The prosthetic device referred to therein had to be sutured into place. The Camp brochure, defendants' exhibit 14.8, is directed to an external prosthesis which is held in place by a bra and appears to be an outgrowth of the Kausch patent number 2,543,499, which was cited against the Cronin patent by the patent office. Finally, the Japanese article, identified as defendants' exhibit 14.3, deals with the injection of silicone fluids directly into the body.

A review of all the prior art cited by the defendants persuades me that it is not as germane as that which was cited by the patent office, thus strengthening the presumption of validity. See La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 445 F.2d 84, 93 (7th Cir. 1971).

Considering the state of the art at the time of the invention of the patent in suit, it is apparent that problems existed in providing an implantable mammary prosthesis that was satisfactory to the patient and also to the medical profession specializing in plastic and reconstructive surgery. Prior to the Cronin prosthesis, the available implantable prostheses were designed to ensure firm attachment of the entire device to body tissues. The record demonstrates that this approach to the design of prostheses produced undesirable results because of the problems of hardness and shrinkage that occurred with the occupation by scar tissue of the attaching material provided.

I conclude that a person of ordinary skill in the art, viewing the art cited by the defendants at the time of the Cronin invention, would not find it obvious. Dr. Edwards' testimony at trial is particularly telling with respect to this point. Even picking and choosing elements from various references, as the defendants urge, would not permit one to construct a device substantially the same as the combination claimed by the Cronin patent.

Cronin's claims call for "a soft gel filling the container." The Bernhardt patent number 2,542,619 is the only prior art patent suggesting a "gel" filler. The evidence adduced at trial established that the "bouncing putty" gel of the Bernhardt patent is considerably different from the silicone gel used in the patent in suit and in the accused device. It was referred to at trial as having the peculiar properties of being both rubbery and a liquid, like "silly putty." It is not a gel in the sense of the one used in the Cronin prosthesis. Further, the Bernhardt patent requires that the filler only partially fill the container and that a gas also be enclosed in the container. No true gel is disclosed in any of the references cited by the defendants.

The Cronin patent teaches either the use of a "corrugated fabric" (claims 1 through 4) or a "tissue permeable anchoring means of sponge-like material attached solely to the rear section for allowing human tissue to grow into said sponge-like material and thereby anchor said material to the chest wall." (Claim 5).

I am unpersuaded by the defendants' argument that the reference in claim 5 to "sponge-like" material is vague and indefinite. Dr. Shepard testified at trial that dacron mesh, the only material described in the Cronin patent, possesses

sponge-like properties allowing tissue growth. When viewed in the context of the prior art and in conjunction with the reference in the specifications to dacron mesh, the claim is not ambiguous.

Of the defendants' prior art references, the only ones showing tissue permeable anchoring means in a mammary prosthesis are the Pangman patents and the Edwards reference. However, in these patents the means of fixation covers the entire prosthesis, which, as the record in this case shows, gives unacceptable results. Leaving off any part of the means of fixation would be contrary to Pangman's and Edwards' teachings and contrary to the state of the art at the time of the Cronin invention.

Drs. Pangman and Edwards purposely covered a smooth skinned inner sac to get fixation all around it so there would be no unsatisfied tissue. Dr. Edwards stated in a 1962 article that one of the characteristics of an ideal breast implant was that it "should become firmly attached to body tissues." See plaintiff's exhibit 11, p. 519. Dr. Pangman claimed in a 1955 article that one of the advantages of having tissue fixation means cover the entire surface of the prosthesis was that it "affords an inert framework which becomes fixed to the surrounding tissue." See defendants' exhibit 14.1, p. 509. Thus, Cronin's device went contrary to the dictates of such prior art. I conclude that it represented a novel and unobvious combination of old elements which cooperated to produce a new and useful result. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); United States v. Adams, 383 U.S. 39 (1966).

B. Cronin as Inventor

■ There exists a strong presumption that Dr. Cronin is the inventor absent clear and convincing evidence to the contrary. Baker Mfg. Co. v. Whitewater Mfg. Co., 298 F.Supp. 1389 (E.D. Wis.1969) rev'd on other grounds, 430 F.2d 1008 (7th Cir. 1970); Acme High-way Products Corp. v. D. S. Brown Co., 431 F.2d 1074, 1083 (6th Cir. 1970). I conclude that the defendants have not met their burden of persuasion.

The story of the development by Dr. Cronin of his prosthesis design spans several years. The record indicates that he was assisted by another doctor as well as an employee at Dow Corning. However, the record is clear that it was Dr. Cronin who conceived the prosthesis and directed its development. It was Dr. Cronin who made the final decisions as to the selection of materials and the design of the prosthesis. Only upon his final approval was his device made available for sale to the public.

■ Without more, the fact that others assisted Dr. Cronin does not mean that he is any less the inventor. P & D Sales & Mfg. Co. v. Winter, 334 F.2d 830 (7th Cir. 1964). This is especially true since the record shows that those who so assisted him claim no credit for the invention and attributed all decision-making and control to Dr. Cronin.

C. Disclosure of Best Mode

■ 35 U.S.C. § 112 requires the disclosure by the patentee of "the best mode contemplated by the inventor of carrying our his invention." In my opinion, Dr. Cronin fully complied with this statutory provision. The patent teaches the cementing of the tissue anchoring means to the back of the prosthesis container. The record demonstrates that he worked with this technique prior to the filing of the application. Moreover, it supports the conclusion that, at the time he filed his patent application, he contemplated that cementing the tissue anchoring means to the back of the container represented the best mode of his invention.

While it was effective as a means for attaching the tissue anchoring means to the prosthesis, nevertheless, the *stitching* procedure was unacceptable to Dr. Cronin; the latter procedure had been developed at the time the patent application was signed and was used until a suitable cement was perfected. Only

four days after he executed the patent application, Dr. Cronin advised Dow Corning that he could ". . . not approve the present backing for (its) production model."

I conclude that Dr. Cronin complied with § 112 to the extent that he set forth his preferred embodiment of his invention. Application of Gay, 309 F.2d 769, 50 C.C.P.A. 725 (1962). This is not a case where the inventor set forth in his patent application a mode which he knew would not work; nor has it been shown that Dr. Cronin purposely failed to disclose a mode which he knew worked better. Dale Electronics, Inc. v. R.C.L. Electronics, Inc., 488 F.2d 382, 388 (1st Cir. 1973).

D. Compliance with Patent Office Claim Amendment Rules

■ The defendants urge that the plaintiff did not comply with rule 133(b) of the rules of practice of the United States patent office because the applicant failed to record the substance of a personal interview with the examiner, which occurred during the prosecution of the Cronin application. Rule 133(b) provides in pertinent part that:

> "In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed by the applicant. . . ."

In an "office action" dated April 25, 1966, the patent office issued a final rejection of what is now Cronin claim 5, on the grounds that it did not structurally define that Cronin claim from various combinations of prior art.

On June 17, 1966, Cronin's attorney met with the examiner. At that interview, the unrecorded character of which is challenged by the defendants, the discussion centered around how the claim in question could be structurally distinguished over the prior art. On August 17, 1966, those amendments to what is now claim 5 which had been authorized during the interview were itemized by the examiner for the record. The words "tissue impermeable" were inserted into the claim, thereby making the entire container tissue impermeable. In addition, the words "of sponge-like material" were added to describe the tissue permeable anchoring means located solely on the back of the container.

Rule 133(b) deals with situations where the prosecution of the application continues after the interview and the applicant makes a subsequent request for reconsideration. In this case, there existed no need for Cronin to request reconsideration because the claim, as amended at the interview, was allowed. See Kearney v. Trecker Corp. v. Giddings & Lewis, Inc., 306 F.Supp. 189 (E.D.Wis.1969), rev'd on other grounds, 452 F.2d 579 (7th Cir. 1971), cert. den. 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796.

E. File Wrapper Estoppel

■ In my opinion, the doctrine of file wrapper estoppel is not applicable to the Cronin claims 1 through 5 under the circumstances presented in this case. Claims 1 through 4 of the Cronin patent were never amended to avoid rejection; such amendment is a prerequisite to the successful invocation of the estoppel doctrine. Taylor-Reed Corp. v. Mennen Food Prod., Inc., 324 F.2d 108 (7th Cir. 1963).

■ Claim 5 did result from an amendment of the claim structure. It is clear, however, that the doctrine of file wrapper estoppel should not operate to limit its interpretation where, as here, there exists a literal infringement of the claim. To rule otherwise would permit "a fraud on a patent." Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

## III. INFRINGEMENT

The parties agree that elements 1 and 2 (relating to a silicone container filled with a silicone gel) of claims 1 through 5 of the patent in suit are present in the

accused device. The defendants suggest that the issue of infringement turns upon element 3 of such claims, namely, the method by which the implant is attached to the chest wall. Their approach with respect to the issue of infringement is, first, that the Cronin patent is a "paper patent" and that the prosthesis disclosed therein has not been successfully marketed.

Secondly, the defendants state that the tissue anchoring means used on the accused device "is not provided to support the prosthesis on the chest wall but rather to keep the axillary prolongation from collapsing or rolling up." The axillary prolongation is a feature unique to the accused device, consisting of a "long tail" or "short tail" prolongation of the tissue impermeable container which extends toward the armpits.

However, the defendants' arguments are inconsistent with certain statements contained in their own patent number 3,665,520. The latter patent is entitled "Surgically Implantable Breast Prosthesis", and it was dated May 30, 1972. Such patent was invented by Collette Perras and Jacques Papillon. With respect to the defendants' "paper patent" argument, it is stated in the Perras-Papillon patent that "the most common breast prosthesis of the gel filled type is shown in U.S. Pat. No. 3,293,663 issued to T. D. Cronin on December 27, 1966." I find no support for the defendants' position in this record.

Statements contained in the Perras-Papillon patent also undercut the defendants' "different purpose" argument. According to that document, the accused device

"... is secured to the chest wall ... by means of a strip ... of felt-like material formed from a polyester material such as Dacron which is provided around the periphery of the axillary prolongation and across the top portion of the back wall ... of the container. ... The prosthesis is secured to the area of the pectoral muscle along the upper portion of the container only. ..."

The fact that dacron *felt*, as opposed to dacron *mesh*, is used by the defendants, and that it arguably has the additional function of maintaining the accused device's unique axillary prolongation "from collapsing or rolling up", does not obviate the fact that such tissue anchoring means allows tissue to grow into or through said material and thereby anchors the prosthesis to the chest wall. Dr. Cronin testified that both dacron felt and mesh were tested. He indicated that, while both could be used for tissue fixation means, he preferred the dacron mesh, which is the only material mentioned in the Cronin patent.

The record indicates that the difference between dacron *mesh* and the dacron *felt*, which is used in the accused device, is one of degree only. Dr. Shepard testified at trial that both types of materials possess "sponge-like" properties, allowing tissue ingrowth. Under these circumstances, I believe that the doctrine of equivalents is applicable. See Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). In *Graver*, the United States Supreme Court noted that "to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." 339 U.S. at 608, 70 S.Ct. at 856. There can be no doubt that claims 1 through 5 of the patent in suit are infringed by the defendants' devices.

## IV. CONCLUSION

For the above stated reasons, the court finds that patent claims 1 through 5 of the U.S. Pat. No. 3,293,663 are valid under the provisions of 35 U.S.C. §§ 102, 103 and 112; and that claims 1 through 5 are infringed by the accused device.

The plaintiff maintains that the defendants' infringement was of such a willful and wanton character that it is entitled to have its damages increased as

**1136**

prescribed under 35 U.S.C. § 284 and to receive reasonable attorneys fees under 35 U.S.C. § 285. I have considered the evidence and authorities cited by the plaintiff in support of these claims and conclude that such extraordinary relief is unwarranted. However, the plaintiff is entitled to an accounting to determine its damages and loss of profits arising from the defendants' infringement. Plaintiff's counsel may submit a proposal to the court as to the means of resolving damages.

Therefore, it is ordered that judgment be entered for the plaintiff on the issues of validity and infringement.

It is also ordered that the defendants' counterclaim on the issues of invalidity and non-infringement be and hereby is dismissed.

It is further ordered that the plaintiff's request to have its damages increased pursuant to 35 U.S.C. § 284 be and hereby is denied.

It is further ordered that the plaintiff's request to recover reasonable attorneys' fees pursuant to 35 U.S.C. § 285 be and hereby is denied.