KEARNEY & TRECKER CORPORA-
TION, Plaintiff-Appellee,

v.

GIDDINGS & LEWIS, INC., Defendant-
Appellant.

No. 18354.

United States Court of Appeals,
Seventh Circuit.

Oct. 28, 1971.

Rehearing Denied Dec. 1, 1971.

Certiorari Denied April 17, 1972.
See 92 S.Ct. 1500.

Pell, Circuit Judge, dissented and filed opinion and dissented to denial of rehearing.

Edward W. Osann, Jr., Chicago, Ill., Marvin E. Klitsner, Milwaukee, Wis., Homer J. Schneider, Chicago, Ill., for defendant-appellant; Wolfe, Hubbard, Leydig, Voit & Osann, Chicago, Ill., Foley & Lardner, Milwaukee, Wis., of counsel.

Edward A. Haight, Chicago, Ill., Thomas W. Ehrmann, Lester S. Clemons, Milwaukee, Wis., for plaintiff-appellee; Quarles, Herriott, Clemons, Teschner & Noelke, Milwaukee, Wis., Haight, Hofeldt & Davis, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, and PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

There are 60 separate claims in plaintiff's twice reissued Brainard patent.[1] Plaintiff originally contended that 29 of the claims were infringed by defendant's machines.[2] After discovery, plaintiff

1. Brainard Re.-Re. 25,737, dated March 2, 1965, covering "Machine Tool With Mechanical Cutting Tool Changer."

2. Defendant's vertical spindle machine was accused of infringing two claims of the original Brainard patent and 10 claims added by reissue; the horizontal spindle machine allegedly infringed 10 original claims and 17 claims added by reissue.

dramatically changed its position. Its charges of infringement were limited to the contention that defendant's vertical spindle machine (Model 15V) infringed claim 15 and that its horizontal spindle machine (Model 25H) infringed claims 19 and 20. Moreover, before the trial commenced, plaintiff advised its licensees, and presumably the trade generally, that it would not thereafter enforce claims 36 through 60 of its Brainard patent.[3]

This dramatic narrowing of the traditional issues of validity and infringement was the consequence of revelations during pretrial discovery. That discovery revealed that immediately after signing the notice of allowance of the original Brainard patent, Primary Examiner Beall retired from the Patent Office and became a paid consultant for plaintiff; his services related to the two reissues of Brainard, as well as the acquisition and reissue of the important Morgan patent.[4]

The district court, 306 F.Supp. 189, held that Brainard's reissue claims 15, 19 and 20 were valid and infringed. These claims were substantially identical with claims in the original Brainard patent.[5] The principal issue raised by this appeal is whether plaintiff's employment of Beall in connection with the reissues of Brainard renders the claims in suit unenforceable. Defendant also challenges the district court's findings of validity and infringement and its holding that the asserted invalidity of certain broad reissue claims was irrelevant; and contends that it is entitled to affirmative relief under the antitrust laws and an award of attorneys' fees.

## I.

Several facets of the record have a bearing on our appraisal of the legal issues. Accordingly, it is appropriate to describe the industry, plaintiff's machines, the Morgan patent, the accused machines, the prosecution of the original Brainard patent and Examiner Beall's connection therewith, the nature of Beall's services to plaintiff after his retirement from the Patent Office, and, finally, the corrective steps taken by plaintiff to cure any possible misuse. We shall then explain why we have decided to reverse.

### A. The Industry.

The parties manufacture automatic machine tools which can perform a variety of machining operations, such as milling, boring, drilling, threading and reaming. For each operation, the exact location, diameter and depth of the hole to be machined in the workpiece are predetermined and defined by a numerical code which can be translated into perforations on tape or cards. The operations are thus controlled "numerically." The concept of numerical control of machine tool operations became commercially important in the early 1950s.

The parties use numerical control, not merely to direct specific operations automatically, but also to control a sequence of operations and the selection of the specific tool needed for each operation. Their machines employ automatic tool changers. For the purpose of this case, they have stipulated that the relevant market may be described as "numerically controlled multi-function machine tools with automatic tool changers."

Since a sequence of operations normally requires the use of a variety of tools,

3. Plaintiff advised the Patent Office that it would not enforce claims 36 through 60. It did not, however, file a formal disclaimer pursuant to 35 U.S.C. § 253. Compare DTX 372A with 37 C.F.R. § 3.43 (disclaimer form—requiring statement that petitioner has reason to believe that "without any deceptive intention" the claims are invalid).

4. Morgan No. 2,901,927, dated September 1, 1959, covering "Automatic Machine Tool."

5. In claims 19 and 20, the term "tool holding means" was changed to "tool securing means," but neither party attaches any significance to this change.

the time required to effect a tool change has a direct and significant impact on costs; the efficiency of the tool changer is, therefore, of vital importance. Plaintiff's automatic tool changer was not the first to be developed, but apparently it is the best.

Plaintiff's "Milwaukee-Matic" machines were introduced in 1958 and first sold in 1959; sales increased each year through 1967 when volume exceeded $36,-000,000. During those years, plaintiff's sales of Milwaukee-Matic exceeded $150,-000,000 compared to competitors' sales of between $75,000,000 and $100,000,000. Moreover, in 1968 plaintiff received approximately $573,000 of royalty income from its Brainard patent. It was a commercial success.

Plaintiff's machines were sold in different models and sizes at prices ranging from about $90,000 to over $350,000 each. Total sales of over 925 units through March, 1968, indicate an average per unit price of about $180,000. Plaintiff did not sell its automatic tool changer except as a part of the Milwaukee-Matic machine, and prior to 1969 was unwilling to discuss a separate license for the tool changer.

Plaintiff's customers include practically all types of manufacturers in the metal cutting industry, including the United States and foreign governments. The precision multiple operating capabilities of plaintiff's machines have contributed to the design and production of new products, especially in the aerospace industry.

Plaintiff's principal competitor in the numerically controlled automatic tool changing field is one of its licensees; at least two competitors are engaged in patent litigation with plaintiff; the total number of manufacturers is apparently about half a dozen. In 1967 plaintiff's sales represented over one-third of the total market.

B. *Plaintiff's Tool Changer.*

Plaintiff's machine uses a horizontal spindle. The tool changer may be simply described. It uses a rotating arm with two hands, one of which approaches the spindle to withdraw the tool which has just completed an operation, while the other is approaching the storage magazine to grasp the next tool to be used. The arm then rotates, simultaneously delivering the new tool to the spindle and returning the old tool to storage. As the arm returns to a parked position, the storage magazine rotates to place a third tool in position for selection after the second has done its job. The selection is controlled by coding on the tools themselves; this "tool coding" (as contrasted with "position coding") makes it possible to place an old tool in the storage position from which the new tool has just been withdrawn without impairing the machine's ability to find that tool (or any other tool) when it is next needed.

This oversimplified description ignores a number of important features of the tool change mechanism,[6] but it serves to identify two concepts which are of principal importance in this litigation: (1) the use of tool coding to identify the tool to be selected from the storage magazine; and (2) the use of a two-handed arm to effect a simultaneous interchange between the magazine and the operating station.

Neither of these concepts is expressly identified in the three Brainard claims which the district court held valid and infringed. Defendant contends, however, that these claims are too broad to be patentable unless limited to machines

---

6. The transfer arm actually moves in three different paths of travel: first, a lateral unhinging motion, from a parked position, which does not interfere with the drilling operation, into a position to make the tool transfer; second, a clockwise and counterclockwise rotation to grasp and exchange the two tools; and third, a horizontal path in order to withdraw the tools from, and subsequently to insert them into, the horizontal spindle and storage magazine. Moreover, other features of the transfer mechanism, such as the grip at the end of each arm, the pivotal movement of the stored tool to place it in position to be grasped by the transfer arm, and the circuitry are the subject of separate claims which are not directly relevant.

using tool coding, particularly since plaintiff relied on this concept to distinguish the prior art—principally the Morgan patent—during the Patent Office prosecution. These two concepts clearly differentiate plaintiff's machines from the Morgan machine.

## C. *Morgan.*

Mark Morgan was a project engineer for International Business Machines Corporation. Apparently he was primarily interested in applying the concept of numerical control to an automatic tool changer. However, it is the mechanical features of the Morgan machine which are relevant here.

The Morgan machine uses a vertical spindle which may be moved down to grasp a tool positioned beneath it. Tools are stored in a vertical position in notches around the periphery of a disc-shaped magazine which has two horizontal paths of movement. First, it rotates until the position in which the desired tool is located is next to the spindle; and second, the entire magazine then moves laterally to place that tool directly beneath the spindle, where it is grasped by a wrenching mechanism which holds it until the spindle has descended and secured the tool. The magazine then withdraws by again moving laterally. After an operation with a tool has been completed, the magazines moves in to retrieve that tool, withdraws, rotates to a new position, moves back in to deliver the second tool to the wrenching mechanism, and then withdraws *again* to await the completion of the second operation.

The Morgan tool change sequence is obviously more time-consuming than plaintiff's simultaneous two-handed interchange which, because the tools themselves are coded, permits the old tool to be stored in the position from which the next tool has been withdrawn.

The claims of the Morgan patent are much broader than the particular machine described in its specifications. The claims may be read to cover plaintiff's machine as well as defendant's, and one of them might encompass any numerically controlled multi-purpose machine tool with an automatic tool changer.[7] Defendant was a licensee under the Morgan patent. Morgan was the principal obstacle to the allowance of plaintiff's Brainard patent. Plaintiff never accepted a license under Morgan, but seriously considered not only a possible license, but also a challenge to the validity of Morgan and ultimately acquired it.

## D. *Defendant's Machines.*

Defendant participated in the development of numerical control for machine tools in the early 1950s. Its two accused machines contain improvements over Morgan, but are apparently inferior to the Milwaukee-Matic. One of them is itself patented.[8] The vertical spindle machine (15V) has been loosely described as "two Morgans with one spindle"; the horizontal spindle machine (25H) more nearly resembles plaintiff's because it uses a rotating two-handed arm to withdraw the old tool from the spindle and to replace it with the next tool. Only a brief description of each machine is necessary.

### 1. *Model 15V.*

Instead of the one disc-shaped magazine used by Morgan, defendant's model 15V uses two. Each rotates in a horizontal plane to place the next tool in line with the spindle. Instead of moving an entire magazine under the spindle as in Morgan, however, the next tool is

---

7. Claim 10 of the Morgan Patent No. 2,-901,927 reads as follows:

 "10. A data programmed machine tool comprising a data storage medium containing data respecting the operation of said machine, data reading means for said medium, and a tool storage matrix operable in response to said reading means for interchanging selected tools with said machine."

8. Lehmkuhl No. 3,200,492, dated August 17, 1965, covering "multiple-use machine with tool changer." The machine described in the specifications is Model 15V.

pushed into the operating position by a one-handed arm, and then grasped by the descending spindle. If only one magazine were used, the operation would be much like Morgan.

By using two magazines alternately, however, a simultaneous exchange of tools may be effected. While the first tool is being withdrawn into its original position in the first magazine, the second tool can be pushed from the second magazine into the operating position. The first magazine can then be rotated to place the third tool in position for insertion while the second magazine remains stationary to await the withdrawal of the second tool after its use.

Plaintiff contends that the simultaneous interchange by means of two one-handed arms, which is effected when the two magazines are used alternately, infringes Brainard's claim 15.[9] The less efficient Morgan-like use of successive tools from the same magazine is conceded to be noninfringing.

### 2. *Model 25H*.

As in the Milwaukee-Matic, the tool change in defendant's model 25H is effected by rotation of a two-handed arm. The old tool, however, is not replaced directly in the storage magazine, but instead is delivered to a shuttle which then carries it laterally to the magazine; the magazine is then rotated to the position from which the third tool is selected by the shuttle for redelivery to the transfer arm and subsequent exchange with the second tool.

Model 25H does not use tool coding, and the use of the shuttle would appear to be more cumbersome and time-consuming than the simple pivot which positions Milwaukee-Matic's next tool for transfer. Moreover, as in Morgan (and unlike the Milwaukee-Matic), the spindle in model 25H moves in the direction of its own axis to grasp and release tools. Nevertheless, the resemblance between the machines supports the district court's finding of infringement of claims 19 and 20.[10]

9. "15. In a machine tool having an operating station arranged to receive different tools; a frame; a tool storage magazine movably supported by said frame and having a tool change station; a plurality of tools removably carried by said tool storage magazine so that the tools in said magazine will move successively past the tool change station upon movement of said magazine; a motor connected to move said magazine; a control system operably connected to regulate the movement of said magazine to locate a succeeding tool at the tool change station while the machine tool is operating with a different tool at the operating station; and tool change means operable when actuated to replace said tool at the operating station with the tool at the tool change station." in said tool [holding] securing means with the selected tool from said storage means; and a source of power connected to rotate said tool change arm for transferring the tools into and out of said tool [holding] securing means.

"20. In a machine tool having a frame and an operating station which is provided with tool securing and operating means; tool storage means carrying a plurality of tools; a tool ready station disposed to selectively receive said tools; selection means connected to select the desired tool in said tool storage means for placement in said operating station; transfer means operating under the control of said selection means to transfer a desired tool in said tool storage means into said tool ready station; a tool change arm rotatably carried by said frame and operable when rotated to transport the tools between said tool ready station and said tool [holding] securing means for replacing a tool in said tool [holding] securing means with the selected tool from said tool storage means; and a source of power connected to rotate said tool change arm or transporting the tools between said tool ready station and said tool [holding] securing means."

10. "19. In a machine tool having a frame and an operating station which is provided with tool securing and operating means; tool storage means carrying a plurality of tools; selection means operative to select a desired tool in said tool storage means for placement in said tool [holding] securing means; a tool change arm rotatably carried by said frame and operable when rotated to replace a tool

E. *Prosecution of the Original Brainard Patent No. 3,052,011.*

The application for the original Brainard patent was filed in the Patent Office on June 27, 1958, and assigned to Division 13, for which T. Emmert Beall was Primary Examiner and R. H. Eanes was Assistant Examiner. On January 27, 1959, the Patent Office rejected 40 of the 49 claims originally asserted.

On September 1, 1959, the Morgan patent issued. About a month later, plaintiff filed the first amendment to its application, modifying many of the original claims and requesting withdrawal of the rejections.[11] Before any office action suance of the Morgan patent and ex-ment, plaintiff called attention to the is-was taken on the first amendment, plaintiff filed a second amendment cancelling 14 claims and adding 12 new claims.[12] In the remarks supporting this amend-plained that the new claims had been drawn to distinguish Morgan.[13]

On December 16, 17 and 18, 1959, pursuant to an invitation extended by plaintiff in November, and with the approval of the Patent Office, Examiners Beall and Eanes visited plaintiff's plant in Milwaukee to observe a demonstration of the Milwaukee-Matic machine. On one evening during this visit they attended a birthday party for plaintiff's president at his home, and the next evening visited in the home of one of plaintiff's patent attorneys.[14]

The first action in the Brainard file wrapper after December, 1959, is an office action dated May 23, 1960, which was signed by Beall but apparently dictated by Eanes. It allowed 12 claims and rejected the remainder, many as being unpatentable in view of Morgan. One of the claims in suit, subsequently allowed as No. 15, was simply "rejected as met by Morgan." Plaintiff's response ber 21, 1960, and explained at length why to this office action was filed on November Morgan was distinguishable.[15]

There is then another interval from November, 1960, until June, 1961, in which no activity is indicated by the file wrapper. However, the possibility of initiating an interference with the Morgan patent was discussed with Examiner Eanes in an interview in Washington during the week of January 25, 1961. The interview is summarized in a memorandum in plaintiff's Patent Department file which indicates that several of the Brainard claims had been rejected on the basis of Morgan.[16] The memorandum makes no reference to Examiner Beall, and Beall did not recall any discussion of a possible interference proceeding. He did, however, recall discussing the possibility of "swearing back of the Morgan patent" with plaintiff's counsel and Eanes.[17] In general, Beall testified that

11. Amendment A, dated October 7, 1959, and filed on October 8, 1959.

12. Amendment B, dated December 14, 1959, and filed on December 16, 1959. It was in this amendment that plaintiff first asserted any of the claims in suit (No. 15 originally filed as No. 58).

13. DTX 1, p. 99.

14. On the same trip they also visited Fond du Lac where they inspected defendant's plant and were entertained by executives of defendant.

15. With respect to claim 15, it was pointed out that the Milwaukee-Matic magazine rotates to locate a new tool at the tool change station while another tool is operating, whereas in the Morgan machine the empty slot in the magazine must remain in position to receive the previous tool while it is operating, and only after the operation is completed is it rotated to place the next tool in position for delivery to the spindle. The explanation adequately distinguishes the Morgan *machine*; whether or not it distinguishes the Morgan *claims* is, of course, another matter.

16. DTX 62, dated January 25, 1961, reads in part:
"Several of the broader claims presently in our Case 834 have been rejected as being drawn to an old combination of elements based on the disclosure in the Morgan patent. However, if the interference decision is in our favor, these claims will become allowable."

17. "It was some time after the 1959 meeting that Mr. Eanes brought Mr. Wutschel, and I believe that Mr. Hajewski, but I am not sure about that, into my office

he gave almost no personal attention to the Brainard application.[18] Eanes, however, testified that Beall personally participated in "several interviews" because plaintiff's counsel, when they did not agree with Eanes, " * * * continually took me to Mr. Beall for further interview." [19]

On June 1, 1961, plaintiff filed a supplement making various technical changes which apparently resulted from office interviews with Examiner Eanes. The next development of significance occurred on September 27, 28 and 29, 1961, when plaintiff's patent counsel conducted a series of interviews with both Beall and Eanes. At these interviews they reviewed drafts of a new set of claims including those subsequently allowed as Nos. 19 and 20. Both Eanes and Beall suggested certain changes to make the claims allowable; both also expressed the opinion that claim 10 of the Morgan patent read on the Milwaukee-Matic machine. A second supplement was filed on October 16, 1961, and in an office action dictated by Eanes and signed by Beall on October 25, 1961, 24 claims, including claims 19 and 20 (at that time numbered 62 and 63), were allowed, and others, including claim 15 (at that time numbered 58), were cancelled or rejected. Thereafter another amendment was filed and considered, and additional claims, including No. 15, were allowed, and ultimately, on June 4, 1962, the formal Notice of Allowance was issued. It was signed by Beall.

The district court found no impropriety in the conduct of either Beall or Eanes prior to the issuance of the original Brainard patent.[20]

### F. Beall's Post-Retirement Service.

Beall retired from the Patent Office on June 22, 1962.[21] The head of plaintiff's Patent Department made a trip to Washington to attend his retirement party two or three days later. On that visit he explored the possibility of employing Beall as a consultant, but Beall then expressed no interest in working for plaintiff.

On July 12, 1962, plaintiff's president met with Beall at his home and came to an understanding concerning his employment. Towards the end of July, Beall visited plaintiff in Milwaukee; on August 1 a written contract for the performance of part-time consulting services for $10,000 a year was executed. The contract was terminable by either party annually, but contemplated a term of five years. Beall actually continued to work for plaintiff until August of 1968 when the nature of his services came to the attention of plaintiff's trial counsel.

Shortly after he was employed by plaintiff, Beall was given two assignments involving an analysis of the relationship between the Morgan and Brainard patents. Ultimately, with the assistance of Beall, both patents were reissued.

### 1. The Brainard Reissues.

Beall's study of Brainard in relation to the prior art led him to the conclusion

on the question of swearing back of the Morgan patent." A.900. To "swear back" of Morgan it would have been necessary to make an oath showing conception of the Brainard invention before the filing date of the Morgan application.

18. "I paid no attention to the machine tool art, which was all handled by two of my experienced examiners. Also, all issues that went through the division would be examined by the assistant chief to see if there were any that required my personal attention, and those that didn't, and most of them didn't, he

would put on my desk and I would sign one after another without opening the file, and that is the way this Brainard case went through my desk." A.938.

19. A. 1015–1016.

20. Defendant contended that the number of personal interviews was excessive and that written statements pertaining to the interviews should have been included in the Patent Office files. The court found no violation of any applicable Patent Office rule or policy.

21. The retirement was voluntary in that Beall, who was then 65, had not reached the mandatory retirement age of 70.

that the invention involved a much broader concept than was described in the allowed claims. In general, the claims related to (1) the simultaneous transposition of the spindle tool and a magazine tool by means of a two-handed arm, and (2) the use of tool coding to avoid either the delay associated with the rotation of the magazine after a used tool has been returned to its original position or else the sophisticated programming that would be necessary if each position had to be indexed first for tool selection and then for tool reception. Beall determined, however, that the Milwaukee-Matic machine had actually pioneered the concept of using a transfer means for bodily moving the selected tool from the magazine to the spindle (since in Morgan the magazine itself moved to the spindle, which then descended to grasp the tool). Thereafter Beall participated in the drafting of the broad claims included in plaintiff's applications for reissuance of the Brainard patent.

The inventor, Brainard, described the broad concept in an interview with one of plaintiff's patent attorneys on July 27, 1962: [22]

"Hajewski: Who conceived the general concept of a single spindle machine tool with a mechanism for transferring a tool from a tool storage medium to the single spindle?

"Brainard: I conceived this general concept as a desirable objective. The development of a mechanism for achieving this broad concept was more or less a process of evolution in which a number of engineers contributed various ideas." (DTX 418 p. 2.)

Generally speaking, the claims in the original patent covered the "mechanism" for achieving this broad concept, whereas the reissue claims were intended to cover the broad concept itself.

Beall worked on the reissues primarily in an advisory capacity, but he also discussed the applications with Eanes, his former subordinate, on more than one occasion. After the first Patent Office action on the reissue application, which was unfavorable, Beall forwarded a proposed amendment to his client. In his forwarding letter he stated:

"Incidentally, it would be helpful to me if my reports were temporarily removed from the file if and when the file is used at the Patent Office. Our friend might note the reports with great glee and attempt to inform a possible evasion of the two year rule. You probably removed them anyway. Further I do not see that any real evasion has been done and do not contemplate filing for register as a patent attorney anyway." (DTX 106, p. 5; A. 123)

Beall did not apply for registration to practice before the Patent Office until February of 1965. On one occasion in December of 1964 Eanes objected to his presentation of an amendment to the second reissue application on the ground that he was not registered. Beall and Eanes lunched together on two or three occasions and discussed the reissue application. The first Brainard reissue was dated May 26, 1964; the second reissue was on March 2, 1965.

In addition to his work on the claims, Beall advised plaintiff on tactics and procedure, including the form and content of the oaths required in connection with the reissue applications. Each oath recited that the patent was partially inoperative because the applicants had failed to claim all that they were entitled to as a result of "inadvertence." The asserted "inadvertence" was the basic point which Beall made in his opinion analyzing the original claims. It was explained in an oath executed by the applicants to overcome certain Patent Office objections in part, as follows:

"That the complete scope of the invention was not fully appreciated before the patent issued and it is now realized that the Morgan patent No. 2,901,927 is the closest tool change art

22. This interview apparently took place only a few days before Beall signed his employment agreement.

available insofar as it discloses the first structure in which a tool is completely removed from a tool storage medium and transferred to a spindle for the performance of work operations, but * * *

"That the present invention represents an advance in the art and includes among its features the broad concept of a tool transfer member operating to extract a tool from the tool storage magazine and transferring the extracted tool to the spindle as distinguished from said Morgan structure in which movement of the tool storage magazine for effecting the tool transfer is effected; * * *." (DTX 2 p. 121)

A memorandum prepared by the vice president of a competitor after his counsel had reviewed the claims added by the first Brainard reissue appraised their significance as follows:

"It was the consensus that the new claims are so broad that they encompass not only the SAC Automatic Tool Changing System, and not only every tool changing system now in use, but also every tool changing system which might be conceived in the future." (DTX 549)

## 2. The Morgan Reissue.

The original application for the Morgan patent was filed on December 27, 1957, and the patent issued on September 1, 1959. A few months later, plaintiff's patent counsel made a preliminary inquiry of I.B.M. about the possibility of taking a license under Morgan.[23] Although the question whether the Milwaukee-Matic machine infringed the Morgan patent was the subject of study by both I.B.M. and plaintiff, no concrete action had been taken by either party before the original Brainard patent issued in September of 1962. They had a negotiating session in April of that year, however, in which the possibility of a license was discussed. In that meeting, plaintiff's patent counsel took the position that only claim 10 of the Morgan patent was arguably infringed by the Milwaukee-Matic machine, and that the broad construction required to support a charge of infringement would render the claim invalid. I.B.M.'s position was that claim 10 was valid and infringed.

In an interview with plaintiff's patent counsel during the prosecution of the Brainard application, Beall had commented on a possible conflict with claim 10 of Morgan. Shortly after Brainard issued and Beall had agreed to serve as a consultant, plaintiff requested him to make a thorough analysis of the possible infringement of Morgan by the Milwaukee-Matic machine. His conclusions confirmed the opinion already formed by plaintiff's patent counsel that only claim 10 was infringed and that claim 10 was invalid.[24] Promptly thereafter plaintiff reopened negotiations with I.B.M.

23. Defendant was granted a license under Morgan in May, 1960.

24. In the conclusion of his 23-page opinion on September 29, 1962 (DTX 83), Beall stated:
"Claim 10—infringed but invalid."
Commenting on Beall's conclusion, plaintiff's counsel stated:
"We were particularly pleased to find that you confirmed our thinking that all of the claims except one are not infringed by the K & T structure and that the remaining claim is invalid in view of the prior art." (DTX 84)
The trial court sustained an attorney-client privilege objection to the admission of these documents. The judge received similar communications between Beall and plaintiff's patent department counsel in evidence. However, he apparently concluded that this exchange of letters between Beall and plaintiff's counsel related primarily to Morgan and that Morgan was not sufficiently material to the present litigation to justify rejection of the privilege. We agree with the trial court's apparent conclusion that it would not be appropriate to protect material communications between Beall and plaintiff's patent department. See Revised Draft of Proposed Rules of Evidence for the United States Courts and Magistrates (March 1971), proposed rule 503(d)(1). This conclusion is applicable to communications relating to Morgan as well as Brainard in view of our analysis of the relationship between the two patents.

In March of 1963, plaintiff consulted Beall about the advantages of purchasing the Morgan patent from I.B.M. Among the advantages which they considered was the fact that Morgan taught "the broad concept of tape control of a tool change mechanism wherein a tool is bodily transferred from a storage member to a rotary spindle." [25] Beall recognized that the concept had been disclosed but not claimed in Morgan and immediately suggested the possibility of obtaining a reissue of Morgan after its acquisition.

Plaintiff also recognized that the acquisition "of Morgan would put K&T in a dominating position relative to the tool change art." To this comment Beall responded: "Especially true [if] Morgan was reissued." They expressly noted that in a reissue, "Morgan claim 10 could be altered to make it valid."

In an agreement effective as of April 1, 1963, plaintiff purchased the Morgan patent for $350,000, plus a share of future royalties. Before recording the assignment, plaintiff requested Beall to draft a set of reissue claims for Morgan, to prepare an opinion on the justification for reissue, and to outline the proper approach to be followed in filing the reissue application and processing it in the Patent Office.

With Beall's guidance and assistance, the application was filed on January 17, 1964, and the patent was reissued on June 29, 1965.[26] In the Morgan reissue, claim 7 was narrowed by adding qualifying language and eleven new claims were added. Except for insignificant changes in punctuation, no amendment to claim 10 was made.

Before the Patent Office, unlike the position taken in its own appraisal during the negotiations with I.B.M., plaintiff contended that claim 10 was valid.[27] It hedged the possibility of a finding of invalidity, however, by the addition of six new claims, each of which incorporated the language of claim 10, plus additional qualifying language. The reissue was allowed on the theory that it narrowed the claims of the original patent to avoid prior art which had been overlooked inadvertently by I.B.M. The inadvertence was reasonable since I.B.M., the original owner of the patent, was a company that "manufactures electrical controls with very little, if any, experience in the machine tool field." [28]

### G. Plaintiff's Corrective Action.

Without conceding any impropriety in the employment of Beall or any misuse of its patent, plaintiff took extensive remedial action summarized as follows in its brief:

1. In August, of 1968 it terminated Beall's consulting contract when the nature of his services with respect to the reissue patents came to the attention of plaintiff's trial counsel.

2. The services of Mr. Wutschel, who had headed plaintiff's patent department for many years, were terminated shortly before trial, he having been made available for extensive deposition by defendant prior thereto.

---

25. The quotation is from DTX 93. This is a memorandum prepared for plaintiff's executive officers by its patent department counsel. It was prepared on March 18, 1963, and sent by counsel to Beall for his comments on March 22 (DTX 94). Those comments are contained in DTX 95 dated March 28, 1963. This series of documents was excluded on the same ground as DTX 83 and 84. We have considered them for reasons previously expressed. See note 24, *supra*. Apparently DTX 93 was excluded on the additional ground that it was essentially a communication between patent department counsel and plaintiff's officers. We believe the request for Beall's comments vitiates the claim of privilege.

26. Re. 25,812.

27. In his oath supporting the reissue application, plaintiff's vice president stated unequivocally " * * * that claim 10 in original form is considered patentable * * * that in order to bring out the further structure involved, claims of the character of claim 10 have been added; * * *." (DTX 7 pp. 86–87)

28. Moreover, counsel for I.B.M. were, for that reason, not familiar with the machine tool industry.

3. Effective in April 1969 plaintiff limited the allegations of infringement to claims 15, 19, and 20.

4. By directors' action taken May 19, 1969, plaintiff relinquished all claims obtained through the reissue and the re-reissue of the Brainard patent (notwithstanding opinions of counsel that no advantage was obtained through the use of Beall's services relating thereto) and licensees were so notified.

5. By letters plaintiff invited its existing licensees to discuss a separate license of a tool changer if they so desired.

6. A revised form of Brainard license agreement was adopted.

7. Plaintiff's patent department was reorganized and thereafter reported to a newly employed attorney-at-law of substantial experience.

## II.

Plaintiff denies that Beall's conduct violated the conflict of interest provisions of the Criminal Code, 18 U.S.C. § 207, or the Rules of Practice of the Patent Office. Even if the policy underlying those provisions was offended by Beall, plaintiff contends that the claims acquired by reissue are not invalid; moreover, since it has virtually abandoned claims 36 through 60, claims 15, 19 and 20 should survive because the original patent was untainted.

For purposes of decision we accept the district court's conclusion that the original Brainard patent was valid when it issued. Moreover, we accept the *bona fides* of plaintiff's significant corrective action. Those remedial steps may not, even impliedly, be taken as an admission of wrongdoing; otherwise we might encourage the obdurate defense of dubious conduct which experienced patent counsel could cause to be corrected. Plaintiff's

curative measures, therefore, are prescinded from our consideration of the merits.

## A.

The district court found that there had been no discussion between plaintiff and Beall about his possible employment until after he had already retired, and that his personal participation in oral interviews and his visit to plaintiff's plant involved no violation of Patent Office policy. We accept those findings. Nevertheless, this background is not irrelevant to our appraisal of Beall's post-retirement conduct.

First, it establishes beyond dispute that Beall participated personally and directly in the deliberations within the Patent Office which preceded the issuance of the original Brainard patent. His signature on the Notice of Allowance was not a mere ministerial act. Second, his employment by plaintiff promptly after the patent issued created an appearance of impropriety that imposed a special obligation on both Beall and plaintiff to avoid conduct which might raise questions about the integrity of the Patent Office itself. For this sequence of events, even though wholly innocent, fits precisely the pattern that a corrupt draftsman would have designed.

Finally, the background reminds us to identify the interests which the Patent Examiner is entrusted to protect. He is not an agent of the inventor or the inventor's assignee employed to assist in the procurement of a patent monopoly.[29] Nor is he a dispenser of monopoly grants, merely arbitrating disputes between rival claimants to a share of the royal prerogative. See Graham v. John Deere Co., 383 U.S. 1, 5–6, 9, 86 S.Ct. 684, 15 L.Ed.2d 545; *cf.*, Darcy v. Allein, 77 Eng.Rep. 1260 (K.B. 1602). For that reason, the significance at-

29. Why then should he, as both Beall and Eanes did, propose language which might make a claim allowable? Plaintiff's answer, implicit in its petition for rehearing, is that the Patent Office does not completely agree with our appraisal of the primary function of the examining procedure. *See* Manual of Patent Examining Procedure, 707.07(j) [R. 20]. See also 707.07(d) [R–27].

tached by the district court to the fact that Beall and Eanes were entertained by defendant as well as plaintiff on their trip to Wisconsin was wholly misplaced. The Examiner does not merely decide who shall receive the monopoly privilege; he must also decide whether the claim shall be allowed at all. For in exchange for the inventor's contribution to the public by the disclosure of the product of his genius, it is the public which pays his justly earned reward.[30] It is the public interest which the Patent Office was created to protect.

### B.

A few months after Beall's retirement from Government service, Congress enacted a new conflict of interest statute. In material part it provides:

"(a) Whoever, having been an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, * * * after his employment has ceased, knowingly acts as agent or attorney for anyone other than the United States in connection with any judicial or other proceeding, application, request for a ruling or other determination, * * * in which the United States is a party or has a direct and substantial interest and in which he participated personally and substantially as an officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, while so employed, * * *

"Shall be fined not more than $10,-000 or imprisoned for not more than two years, or both: * * * * "[31]

Plaintiff does not dispute that, by reason of his former status as a Primary Examiner for the Patent Office, Beall was a person to whom the statute applied. It is also clear that the potential impact on the public of the reissue applications placed them in the category of matters in which the United States has a direct and substantial interest.[32] Plaintiff argues, however, (1) that Beall did not act as an "agent or attorney" within the meaning of the statute, and (2) that the reissue applications were not matters in which Beall had participated while employed by the Government.

The first argument, in substance, is that Beall was not counsel of record for the plaintiff, but merely provided it with off-the-record aid and assistance.[33] Un-

---

30. "Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." Kendall v. Winsor, 62 U.S. (21 How.) 322, 329, 16 L.Ed. 165.

"In a former argument in this court, it was said to be worth more than twenty-five millions of dollars. This has been taken from the people, from the public, and made the private property of the patentee by the action of one of the departments of the government acting under the forms of law, but deceived and misled, as the bill alleges, by the patentee." United States v. American Bell Telephone Co., 128 U.S. 315, 370, 9 S.Ct. 90, 98, 32 L.Ed. 450.

31. Section 207—P.L. 87–849, 76 Stat. 1119, 1123, enacted Oct. 23, 1962; 18 U.S.C. § 207(a). Defendant also relies on § 207(b), but we find it unnecessary to consider the possible application of that portion of the statute.

32. "The United States, by issuing the patents which are here sought to be annulled, has taken from the public rights of immense value and bestowed them upon the patentee. In this respect the government and its officers are acting as the agents of the people, and have, under the authority of law vested in them, taken from the people this valuable privilege and conferred it as an exclusive right upon the patentee. This is property, property of a value so large that nobody has been able to estimate it." United States v. American Bell Telephone Co., 128 U.S. 315, 370, 9 S.Ct. 90, 98, 32 L.Ed. 450; see also S.Rep.No.2213, 87th Cong.2d Sess., 1962 U.S.Code Cong. & Ad.News pp. 3854, 3861.

33. This argument is supported by Congress's rejection of proposed statutory language which would have made it improper for a former employee merely to "aid or assist" someone else in connection

deniably, however, as a full review of the facts demonstrates, in rendering legal advice and performing drafting and other services for plaintiff, Beall was acting in his professional capacity as an attorney even if we ignore his personal contacts with Eanes. The matters on which he worked were not mere technicalities; they were of great importance. The fact that his participation was not fully and frankly disclosed does not avoid the statutory proscription.

Plaintiff's second argument is also asserted as a basis for avoiding the operation of Patent Office Rule 341(g). That rule disqualifies a former examiner from the registration which is required as a precondition to practice in the Patent Office "unless he undertakes (1) not to prosecute or aid in any manner in the prosecution of any application pending in any examining division in which he served during his period of service therein; and (2) not to prepare or prosecute nor to assist in any manner in the preparation or prosecution of any application of another filed within two years after the date he left such division, and assigned to such division, without the specific authorization of the Commissioner." [34]

Since Beall did not apply for registration until more than two years after his retirement, he apparently considered the

language of the rule inapplicable. Quite clearly, however, the rule reflects an underlying policy that former examiners should not perform the kinds of service that would make them ineligible for registration. Moreover, it is equally clear that the second clause made it inappropriate for Beall "to assist in any manner" in the preparation or prosecution of the first Brainard reissue application assigned to Division 13 without the specific authorization of the Commissioner of Patents.[35]

The language of the first clause of the rule raises the same question as the conflict of interest statute. Should the applications for reissue be regarded as new matter or as something that had been pending before Beall retired? A fair appraisal of plaintiff's argument requires consideration of the nature of a reissue.

### C.

To place the subject of reissues in proper perspective, it should be noted that less than 1% of the patents which are granted are subsequently reissued.[36] The patent privilege is "an exception to the general rule against monopolies and to the right to access to a free and open market." Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 816,

---

with a matter in which he had participated. See "Memorandum of Attorney General Regarding Conflict of Interest Provisions of Public Law 87–849," 28 Fed.Reg. 985 (Feb. 1, 1963) quoted at 18 U.S.C.A. §§ 1 through 370, pp. 282, 285.

On the other hand, subsection (a) of § 207 covering action as an agent or attorney is clearly intended to prohibit a broader range of conduct than subsection (b) which refers to one who "appears personally before any court or department as agent, or attorney. * * *" See *ibid.*

34. 37 C.F.R. § 1.341(g) as amended, 27 Fed.Reg. 830 (Jan. 27, 1962). Prior to the amendment, clause (1) of the rule referred to "any application pending in any examining division in which he served, on the date he left said division."

35. The second Brainard reissue application, also assigned to Division 13, was filed more than two years after Beall's retirement from the Patent Office.

The application for the Morgan reissue was filed on January 17, 1964, within two years of Beall's retirement. Neither the original application nor the reissue application was assigned to Division 13. However, Rule 341(g) also provided that "[A]ssociated and related classes in other divisions may be required to be included in the [former examiner's] undertaking. * * *" Beall's participation in connection with the Morgan reissue may therefore have conflicted with Patent Office policy.

36. Defendant's patent on the accused 15V machine was No. 3,200,492 (R. A. Lehmkuhl) dated August 17, 1965. The second Brainard reissue dated March 2, 1965, was No. 25,812.

65 S.Ct. 993, 998, 89 L.Ed. 1381. Reissues, then, are a narrow category within an exception to the general policy of free competition.

■ The purpose of the patent grant is to reward, and thereby to encourage, invention by exchanging a limited exclusive right for disclosure of the inventor's novel concept. Early patent cases identified the contractual character of the "quid pro quo" exchanged between the inventor and the public. See, e. g., Pennock v. Dialogue, 27 U.S. (2 Pet.) 1, 14, 7 L.Ed. 327. At the time the patent issues, the inventor's disclosure to the public is complete. Having dedicated his idea to the public domain, he has no further consideration to deliver in exchange for additional monopoly protection to be obtained by a reissue of his patent. Nevertheless, the contract analogy is the source of the recognition of reissues.

Before the Patent Office examining procedures had been initiated, the issuance of a patent was a ministerial act, subject to judicial review should infringement litigation arise. Since a technical defect in the specifications invalidated the patent, the inventor was permitted to retain the benefit of his bargain with the public by cancelling his patent and obtaining a reissue " 'when the defect in the specification arose from inadvertence or mistake, and without any fraud or misconduct on the part of the patentee.' " Grant v. Raymond, 31 U.S. (6 Pet.) 218, 240, 8 L.Ed. 376. In such a case, the reissue was necessary to the "faithful execution of the solemn promise made by the United States." [37]

■ The reissue privilege which was originally recognized to correct defects in the nature of a scrivener's error remains in the law today. The statutory privilege has been broadened but still contains the historic limitation that no new matter may be introduced in a reissue application. Maxant Button & Supply Co. v. Sears Roebuck & Co., 388 F.2d 912, 916–917 (7th Cir. 1968). Any reissue, since it is predicated solely on the invention disclosed in the original patent, necessarily relates back to the original application for its justification. The statute provides, in part:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue. * * *" 35 U.S.C. § 251.

Broadening reissues contain risks of abuse not involved in the mere correction of an error in the specification or in a narrowing reissue. As the Supreme Court has pointed out, in cases involving broadening reissues the circumstances of the original application may have special relevance to the deliberations within the Patent Office.[38]

37. "If the mistake should be committed in the department of state, no one would say that it ought not to be corrected. All would admit that a new patent, correcting the error, and which would secure, to the patentee the benefits which the law intended to secure, ought to be issued. And yet the act does not in terms authorize a new patent, even in this case. Its emanation is not founded on the words of the law, but is indispensably necessary to the faithful execution of the solemn promise made by the United

States. Why should not the same step be taken for the same purpose, if the mistake has been innocently committed by the inventor himself?" Grant v. Raymond, 31 U.S. (6 Pet.) 218, 242, 8 L.Ed. 376.

38. "Now, in our judgment, a patent for an invention cannot lawfully be reissued for the mere purpose of enlarging the claim, unless there has been a clear mistake inadvertently committed in the wording of the claim, and the application for

We, therefore, conclude that Beall's participation as an attorney in the prosecution of the Brainard reissues involved the same conflict of interest as if he had transferred his allegiance while the original application was still pending. His conduct was indefensible.

### D.

In our opinion claims 36 through 60 of Brainard Re.-Re. 25,737 are invalid.[39] The misconduct evidenced by this record is no less serious than concealment of the true identity of the author of a technical article, cf., Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, or the concealment of a prior use by the brother of the inventor, Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293. As those cases hold, therefore, the facts call for nothing less than a complete denial of enforceability of any of the claims acquired by reissue.[40]

In Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247, the Court characterized a patent procured by fraud as not merely unenforceable but invalid. The Court recognized a distinction between so-called "technical fraud," which might result from "an honest mistake" (id. at 177, 86 S.Ct. 347) or from a "judicial finding of 'obviousness'" (id. at 179, 86 S.Ct. 347, Harlan, J., concurring), and fraud involving the willful misrepresentation of facts to the Patent Office. Walker's allegations fit the latter category. To support its conclusion that Walker's action was not barred by the rule that only the United States may sue to cancel or annul a patent, the Court quoted a passage from the *Precision Instrument* opinion which is relevant here:

"The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." 382 U.S. at 177, 86 S.Ct. at 350 (quoting from 324 U.S. at 816, 65 S.Ct. 993, 89 L.Ed. 1381).

We think the phrase "fraud or other inequitable conduct" encompasses the

---

a reissue is made within a reasonably short period after the original patent was granted. The granting of such reissue after the lapse of long periods of time is an abuse of the power, and is founded on a total misconception of the law. The Commissioner of Patents has evidently proceeded, in these cases, on the view that a patent may be reissued after any lapse of time, for the purpose of making a broader claim, by merely showing that the claim might have been broader than it was, and that it was inadvertently made too narrow at the time. In this we think he has been entirely in error. Lapse of time may be of small consequence on an application for the reissue of a patent on account of a defective specification or description, or where the original claim is too broad. But there are substantial reasons, not applicable to these cases, why a claim cannot be enlarged and made broader after an undue lapse of time. The rights of the public here intervene, which are totally inconsistent with such tardy reissues; *and the great opportunity and temptation to commit fraud after any considerable lapse of*

*time, when the circumstances of the original application have passed out of mind,* and the monopoly has proved to be of great value, make it imperative on the courts as a dictate of justice and public policy, to hold the patentees strictly to the rule of reasonable diligence in making applications for this kind of reissues." Mahn v. Harwood, 112 U.S. 354, 359–360, 5 S.Ct. 174, 177–178, 28 L.Ed. 665. (Emphasis added.)

39. Despite 18 U.S.C. § 218, a final conviction under § 207 is not a necessary predicate to a determination that the reissue claims are invalid. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268. See S.Rep.No.2213, 87th Cong.2d Sess., 1962 U.S.Code Cong. & Ad.News p. 3863.

40. Indeed, in *Keystone Driller* the court denied relief with respect to patents untainted by the fraud as well as the tainted claims. See also Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381.

kind of conduct disclosed by this record. A violation of the proscriptions against conflict of interest to obtain a broadening reissue involves the same threat to the public interest as actual fraud practiced on the Patent Office. *Cf.*, United States v. Mississippi Valley Generating Co., 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed. 2d 268.

A review of the projects on which the former Primary Examiner provided technical and tactical guidance reveals gross abuse of the statutory privilege of reissue to cure defects resulting from "inadvertence." It is quite clear that the inventor who conceived the desirable objective of using an independent means to transfer a tool from the storage magazine to the operating spindle shortly after he began work on the Milwaukee-Matic project in 1956 did not consider that broad concept patentable. It was Beall, several years later, who discovered the inadvertence in failing to file claims encompassing that broad concept. Beall also had recognized the overlap between claim 10 of the Morgan patent and the Milwaukee-Matic machine while he was still Primary Examiner of Division 13; that overlap was a factor subsequently considered in connection with the acquisition and reissuance of Morgan to enlarge plaintiff's "dominating position relative to the tool change art." Whether the reissue of Morgan could truly be defended as narrowing [41] when the validity of claim 10 was reasserted and reenforced by the addition of related claims after plaintiff and Beall had privately concluded that claim 10 was invalid, is a question we need not decide. It is, however, manifest that the use of Morgan was ancillary to plaintiff's purpose to obtain a monopoly on the broad concept recognized by Brainard in 1956, but not protected by the patent issued in 1962.

Though the facts, the time intervals, and the relevant statutory provisions differ, we believe the Supreme Court's comments in Miller v. Brass Co. are strikingly apt:

"But there is another grave objection to the validity of the reissued patent in this case. It is manifest on the face of the patent, when compared with the original, that the suggestion of inadvertence and mistake in the specifications was a mere pretence; or if not a pretence, the mistake was so obvious as to be instantly discernible on opening the letters-patent, and the right to have it corrected was abandoned and lost by unreasonable delay. The only mistake suggested is, that the claim was not as broad as it might have been. This mistake, if it was a mistake, was apparent upon the first inspection of the patent, and if any correction was desired, it should have been applied for immediately.

"These afterthoughts, developed by the subsequent course of improvements, and intended, by an expansion of claims, to sweep into one net all the appliances necessary to monopolize a profitable manufacture, are obnoxious to grave animadversion. The pretence in this case that there was an inadvertence and oversight which had escaped the notice of the patentee for fifteen years is too bald for human credence." 104 U.S. 350, 351–352, 26 L.Ed. 783.

Having concluded that claims 36 through 60 are invalid, we must consider the effect of that conclusion on claims 15, 19 and 20 in view of the provisions of the 1952 amendments to the Patent Code dealing with reissues and disclaimer.

### E.

■ Unlike an original patent in which all claims have effect from the same date of issue, the claims in a reissued patent may have different effective dates. As 35 U.S.C. § 252 now provides,

---

41. The Morgan patent issued in 1959. Plaintiff could not have obtained a broadening reissue in 1963. Section 251 provides in pertinent part:

"No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent."

to the extent that the claims of a reissue patent are identical with the original patent, they "constitute a continuation thereof and have effect continuously from the date of the original patent." Thus, claims 15, 19 and 20 were effective as of September 4, 1962, whereas claims 35 through 60 were effective as of May 26, 1964, or March 2, 1965. This provision supports plaintiff's argument that the invalidity of the added claims should not impair the enforceability of the original claims.

We believe, however, that the answer to the precise question presented here is found in other provisions of the Code. Section 252 was enacted to deal with the problem of intervening rights of third parties who may have relied on the limited scope of the original patent before the reissue was allowed. See Frederico, "Commentary on the new Patent Act," preceding 35 U.S.C.A. at pp. 45–47. This provision did not eliminate the requirement that the original patent be surrendered for cancellation at the time of a reissue. Indeed, except for the provision relating to intervening rights, § 252 itself expressly provides that "every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, * * *."

■ If an original patent contains some claims which are valid, and some which are invalid, it is now settled that the patentee may sue on the valid claims provided that a specific statutory condition is met. Formerly, unless promptly disclaimed, an invalid claim would vitiate the entire patent. Ensten v. Simon, Ascher & Co., 282 U.S. 445, 51 S.Ct. 207, 75 L.Ed. 453. The rule was based on the potential deterrence to competitors who might not realize that an allowed claim was in fact invalid. *Id.* at 453, 51 S.Ct. 207. This deterrence would be eliminated by filing a formal disclaimer which would then come to the attention of any member of the public investigating the status of the patent. See Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 58, 63 S.Ct. 1393, 87 L.Ed. 1731.

Now, even without a formal disclaimer, the invalidity of one claim does not thereby render the remaining claims invalid. Like the right to sue on a valid claim in a patent containing invalid claims, however, the statute expressly identifies a condition which must be met. That condition is that the claim be invalid "without any deceptive intention."

The disclaimer section now provides, in part:

"Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid." 35 U.S.C. § 253.

And the authorization for an action for infringement of a patent containing an invalid claim provides, in part:

"Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid." 35 U.S.C. § 288.

Plaintiff cannot meet the statutory condition. As we have already noted, in *Walker* the Supreme Court recognized a distinction between so-called technical fraud, based for example on a finding of obviousness, and actual fraud or other inequitable conduct. We believe the statutory requirement "without deceptive intention" identifies the latter category and that Beall's conduct falls within it. Claims 36 through 60 are invalid but not "without any deceptive intention." Fairly read, § 288 prohibits the maintenance of any action on a patent which includes claims which are invalid by reason of deceptive intention. This reading is supported by the inclusion of the same condition in § 253.[42]

■ We have no doubt that plaintiff is chargeable with responsibility for

42. That condition also prevented plaintiff from filing a formal disclaimer. See footnote 3, *supra.*

Beall's conduct. The trial court so found. His employment was negotiated by the president of the company. His services related to matters of vital importance to the company. He worked closely with the head of the company's patent department and cautioned him about the desirability of avoiding reference to his participation in the matter. The fact that he accepted relatively nominal compensation for his part-time labors does not exclude plaintiff from full responsibility for the work it employed and directed Beall to perform. Accordingly, plaintiff is chargeable with "deceptive intention" within the meaning of the Patent Code. As we read the statute, the infringement action must therefore fail.

We have considered and reject plaintiff's contention that its significant curative steps, including virtual abandonment of the claims acquired by reissue, have cleansed its hands sufficiently to protect the viability of claims 15, 19 and 20. Since plaintiff is charged with responsibility for, and knowledge of, Beall's conduct, its commencement of this litigation, asserting infringement of the reissue claims as well as those still in dispute, was itself an abuse of the patent privilege. Not until after Beall's conduct was revealed during pretrial discovery did plaintiff renounce its efforts to exploit the broadening reissues. More fundamentally, since the conduct is within the "deceptive intention" category, the curative steps cannot overcome the statutory objection to maintenance of the action.

## III.

Two related questions remain. Defendant contends that it should recover its attorneys' fees pursuant to 35 U.S.C. § 285, and treble damages pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15.

## A.

We agree that this is an exceptional case and that the recovery authorized by § 285 should be allowed.[43] The factors which we consider of controlling importance are not the protracted and complex character of the litigation but rather the nature of plaintiff's wrongdoing and its potential impact on the public. See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp., 407 F.2d 288, 294 (9th Cir. 1969); cf., Scott Paper Co. v. Fort Howard Paper Co., 432 F.2d 1198, 1204–1205 (7th Cir. 1970), cert. denied, 401 U.S. 913, 91 S.Ct. 882, 27 L.Ed.2d 812. It is of paramount importance that neither the integrity of the Patent Office, nor public confidence in that integrity, be impaired. Moreover, the public has a comparable interest in identifying and forestalling the kind of abuse of the narrow statutory reissue privilege which is disclosed by this record. Instead of the proper correction of an inadvertence, necessary to ensure that the inventor or his assignee will receive a fair reward for his disclosure, the Brainard and Morgan reissues were strategic maneuvers in a co-ordinated campaign to aggrandize control over an entire basic industry. A patent is not a beachhead from which, once secured, a patentee may scout adjacent territory for possible conquest by means of acquisition and reissue. By casting a revelatory light on the potential impact of broadening reissues, defendant, in the proper pursuit of its own private interests, has performed a significant public service.

## B.

The wrongful acquisition of monopoly power is prohibited by § 2 of the Sherman Act. The parties have stipulated that the relevant market is multifunction machine tools with automatic tool changers. Since plaintiff controls

43. 35 U.S.C. § 285 provides:
"The court in exceptional cases may award reasonable attorney fees to the prevailing party."

only about one-third of that market, it has not achieved monopoly status. See United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2nd Cir. 1945). Plaintiff's actual position in the industry is not, however, the sole test of violation of § 2. By condemning attempts to monopolize, that section directs itself against dangerous probabilities as well as the completed result.[44]

A reliable or accurate measure of the actual likelihood that plaintiff would have achieved monopoly status if Beall's wrongful conduct had never been disclosed is, of course, not possible. However, we do not understand the "dangerous probability" test to involve an evaluation of the actual likelihood that an attempt would have succeeded if not frustrated by an intervening event. Rather, it requires an appraisal of the alleged offender's ability to achieve the forbidden result,[45] his intent,[46] and the nature of his overt actions.[47] In an antitrust context we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct. The ultimate concern is the firm's actual or threatened impact on competition in the relevant market.[48]

Plaintiff's size, representing one-third of the industry, was "impressive." See United States v. Columbia Steel Co., 334 U.S. 495, 533, 68 S.Ct. 1107, 92 L.Ed. 1533. At least one significant competitor was a licensee under the Brainard patent. Plaintiff's patent position was fortified by its ownership of Morgan. Its sale and license arrangements were highly profitable. Clearly plaintiff was a firm with the capacity to make a serious attempt to acquire monopoly status.

Plaintiff cannot deny that it intended to acquire the power to exclude competition from the portion of the market described in the broad claims of the twice reissued Brainard patent. A competitor described those claims as broad enough to cover " * * * not only every tool changing system now in use, but also every tool changing system that might be conceived in the future." We need not accept that description to recognize that exclusive control of the broad concepts encompassed by these claims, when added to the firm's other attainments (including its acquisition of Morgan and the products of its own ingenuity), would endanger the competitive process. Fulfillment of its objectives would have significantly enhanced its market position.[49]

---

44. "Intent is almost essential to such a combination and is essential to such an attempt. Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. Commonwealth v. Peaslee, 177 Mass. 267, 272, 59 N.E. 55. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." Swift & Company v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L. Ed. 518.

45. "Whenever the law makes one step towards the accomplishment of an unlawful object, with the intent or purpose of accomplishing it, criminal, a person taking that step, with that intent or pur-

pose, *and himself capable of doing every act on his part to accomplish that object*, cannot protect himself from responsibility by showing that, by reason of some fact unknown to him at the time of his criminal attempt, it could not be fully carried into effect in the particular instance." Commonwealth v. Jacobs, 9 Allen 274, 275 (Mass.1864) (Emphasis added).

46. Thacker v. Commonwealth, 136 Va. 767, 114 S.E. 504 (1922).

47. Commonwealth v. Peaslee, 177 Mass. 267, 59 N.E. 55, 56–57 (1901).

48. See Report of the Attorney General's National Committee to Study Antitrust Laws (1955), 8, 11.

49. There can be no doubt that the power to require all competitors either to accept licenses and therefore incur royalty costs or to abandon production of any machines infringing the broadened Brainard reissue claims would have an impact on price and output in the relevant market.

We have concluded that plaintiff's employment of Beall was conduct comparable to that condemned by the Supreme Court in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247. Because of its wrongful character and its potential for harm to the public, that conduct is appropriately characterized as "predatory."

 Thus, the uncontradicted evidence establishes plaintiff's capacity to commit the offense, its intent to acquire the power to exclude competition from a significant share of the market, and its use of predatory means to accomplish its purpose. In *Walker* the Court held that the enforcement of a fraudulently procured patent would give rise to a § 2 violation if the exclusionary power of the illegal patent claim in the relevant market for the product involved exceeded accepted antitrust criteria.[50] Since we find the same objection to the procurement of a patent by violation of conflict of interest principles as by fraud, under our appraisal of the exclusionary power of the Brainard reissue claims, that holding persuades us that plaintiff has violated § 2 of the Sherman Act.

This conclusion is consistent with other evidence in the record upon which defendant places great stress. Thus, the provisions in plaintiff's licenses prohibiting separate manufacture or sale of the patented automatic tool changer and requiring licensees to pay royalties on an entire machine tool even though the patented unit represented only about 10% of its cost are probative of an intent to exclude competition and to enhance prices. *Cf.*, American Photocopy Equipment Co. v. Rovico, Inc., 359 F.2d 745 (7th Cir. 1956). Similarly, although the acquisition of one of two dominating patents by the owner of the other has not been held to constitute a violation of the antitrust laws, plaintiff's acquisition of Morgan may be taken as evidence of an intent to restrain competition. *Cf.*, United States v. Singer Manufacturing Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823. We do not, however, rely on that evidence because it is subject to different interpretations which would require the kind of evidentiary analysis that should be made by the district court in the first instance. The basic factors on which we do rely do not involve the resolution of any disputed questions of fact. We have not disturbed any of the findings made by the district court and we have no doubt that if he had considered the reasoning of *Walker* applicable to plaintiff's employment of Beall, as we have held, he would also have found a violation of the Sherman Act.

### C.

Even though defendant has proved a violation of the Sherman Act, to recover damages he must also demonstrate that plaintiff's conduct "injured [him] in his business or property." 15 U.S.C. § 15. We are not at all sure that defendant has met this additional burden.

Defendant contends that plaintiff unlawfully acquired a dominant position in the market and that a sales advantage, once obtained, tends to "pyramid" to the inevitable disadvantage of competitors. There is force to this contention, but certain qualifications must be identified.

We have accepted the district court's conclusion that the original Brainard patent was valid when it issued on September 4, 1962. By then, presumably by virtue of the superior quality of its machine, plaintiff had already obtained a position of market leadership. No adverse impact on defendant appears to have resulted from the acquisition of Morgan in 1963.[51] Not until after the

50. Day, "Relation of Patent Validity to Antitrust," 39 Antitrust Law Journal 808 (1969–70).

51. Plaintiff's acquisition of the Morgan patent did not affect defendant's license thereunder. The license was negotiated with I.B.M.; the amount of royalty payable was unaffected by the identity of any subsequent owner of the patent. Although the transfer of ownership may have enhanced plaintiff's market power, an adverse impact on defendant did not necessarily ensue.

date of the first reissue of Brainard on May 26, 1964, can defendant properly suggest that the *in terrorem* effect of the invalid claims obtained by reissue had any impact on its own research and development. Indeed, it was not until May of 1966 that plaintiff notified defendant of its position that the Brainard patent was being infringed. The sales pyramid may, therefore, have been constructed on a lawful foundation.

Defendant has also argued that plaintiff's dominant position, coupled with its restrictive licensing practices, has enabled it to enhance the price level. If this be so, defendant, as a competing manufacturer of machines, would not have been injured.[52] Defendant asserts, however, that it was also a customer of plaintiff. We are not sure how significant its purchases were, when they occurred, or even whether they were Milwaukee-Matic machines.

Finally, defendant's president testified that certain potential customers, particularly in Europe and Japan, declined to make purchases from it because of concern about possible infringement of the Brainard patent, including the claims acquired by reissue. We are unable to appraise the significance of this testimony as a matter of first impression.

In the district court the parties agreed to postpone any determination as to the amount of damages until after final decision on the merits. The trial did encompass the question whether defendant suffered any injury by reason of an antitrust violation. Because it found no violation of the antitrust laws, the district court had no occasion to make any findings on the fact of damage issue. On this issue the burden of proof is upon defendant; as indicated, we are not at all sure that it has sustained its burden. On the other hand, we cannot say as a matter of law that it suffered no injury whatsoever. The issue is one which the district court is better able to resolve

than we are. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123–125, 89 S.Ct. 1562, 23 L.Ed.2d 129. Whether it is necessary or appropriate to hear additional evidence on this factual issue we leave to the district court's sound discretion.

The judgment is reversed and the case is remanded to the district court with directions to enter judgment in favor of the defendant on the complaint, to make an appropriate award of attorneys' fees, and to conduct such additional proceedings on the counterclaim as it deems appropriate in the light of this opinion.

PELL, Circuit Judge (dissenting).

While appreciating the closely reasoned, analytical opinion of Judge Stevens, I find that I am unable to concur in the result reached. Therefore I respectfully dissent.

Condensing the majority opinion to its pivotal point, although admittedly not an easy task considering its breadth, it appears to me that it imposes punishment for misconduct not legally related to patent claims sought to be enforced.

We have here patent claims in suit which the district court found to be valid and infringed. The majority opinion does not reach an opposite result other than upon the matter of the alleged misconduct, yet the claims are cut off as a basis for judicial enforcement because of ex post facto circumstances.

I cannot help but feel that this court, although not purporting to do so, is nevertheless using this litigation as a vehicle for punishing conduct which it finds reprehensible.

Today's climate of lack of public confidence in governmental officials is not conducive to judicial condonation of any unethical or otherwise improper behavior on the part of such officials. Nothing I say herein is to be taken as any approval of the conduct of either the plaintiff or

---

52. Defendant identifies a number of restrictive provisions in the Brainard license agreements. But defendant never took a license under the Brainard patent, and to the extent that those provisions made plaintiff's licensees less effective competitors, defendant certainly was not harmed.

Beall subsequent to the latter's retirement and prior to the plaintiff's abandonment of the claims acquired by reissue. Although plaintiff in taking its "extensive remedial action" did not concede any impropriety in the employment of Beall nor that any advantage was obtained through the use of his services on the two reissues, the majority opinion terms Beall's conduct indefensible. For the purposes of this dissent, I am accepting this categorization.

However, the indefensible conduct occurred subsequent to the granting of the original patent which included claims 15, 19 and 20. The district court found no irregularity in any prior conduct and the majority opinion accepts the finding. Instead of letting the matter stand there and proceeding to the impact of 35 U.S.C. § 288 on the situation, the majority opinion relates the prior events as relevant "background." How so? I would like to dispel my lingering suspicion that the majority feels that the prior conduct itself constituted some crippling irregularity.

At most, the activity in question might have caused Beall to feel that he was suspect and perhaps it should have indicated to him that he should have no post-retirement connection with the patent, thereby making having the connection in fact more reprehensible. But the point of subsequent reprehensibility is not herein denied; rather, my thesis is that subsequent activity should not be retroactively applied to invalidate that which was otherwise validly achieved without found irregularity.

The majority opinion achieves retrospective invalidation via 35 U.S.C. § 288 in the words "without deceptive intention" but ignores the clear mandate of 35 U.S.C. § 252 that the claims of the original patent "have effect continuously from the date of the original patent."

The specific matter before us appears to be one of first impression and because

of this country's historical, and properly founded, animadversion to legislation smacking of ex post facto characteristics, I am unable to construe 35 U.S.C. § 288 as meaning that Congress intended any more than that the "deceptive intention" applied to patent claims of a contemporaneously effective date, some of which are invalid because of deceptive intention. The result, however, of the majority opinion is to carry back the taint to earlier claims, to visit the sins of the son upon the father.

Properly, it seems to me, the patent claims once found valid should be clothed with protective immunity not subject to being pierced by subsequent misconduct of the collateral type here involved. This, of course, would not attach where subsequent direct misuse was involved.

While the issue of deceptive intention was not before the court in Foxboro Co. v. Taylor Instrument Companies, 157 F.2d 226, 228 (2d Cir. 1946), cert. denied, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684 (1947), the principle enunciated by Judge Learned Hand in that case would seem to me to be applicable: " * * * the surrender of the original patent, resulting from the acceptance of the reissue, did not invalidate any claims which he [the original patentee] carried over into the reissue."

Judge Hand was of the opinion, as I am, that the matter was set at rest by the amendment of the precursor of 35 U.S.C. § 252. Section 252 was taken from Section 64 of Title 35 [1] and it is of interest to note that the prior section refers to "fraudulent or deceptive intention" but relates this only to error in connection with the original patent.

We have here in the original patent, claims of an invention filling a much needed want, one entering into immediate use and one meeting with substantial commercial success. *See* England v. Deere & Co., 284 F.2d 460, 463 (7th Cir.

---

1. Act of July 8, 1870, ch. 230, § 53, 16 Stat. 205, amended May 24, 1928, ch. 730, 45 Stat. 732. Section 64, as amend-

ed, is set out in 35 U.S.C.A. Appendix II at 833.

1960), cert. denied, 365 U.S. 870, 81 S.Ct. 904, 5 L.Ed.2d 860 (1961).

In my opinion, the plaintiff having effectively abandoned all claims other than the three which were based on the original patent, 35 U.S.C. § 252 is a proper basis for the bringing of the present action and makes proper the decision reached by the district court.

Further, in any event, I think the district court's decision should be affirmed because of the positive ameliorating steps taken by the plaintiff. The majority opinion properly refrains from drawing any inference of misconduct from the curative actions taken. To do otherwise would be highly inconsistent with a desirable public policy. Analogies such as the lack of admission in offers to compromise and in repairing faulty premises subsequent to an accident come to mind.

Those analogies also should remind us of the underlying policy rationale that action such as that taken by plaintiff here would be discouraged if it were to be the basis of any admissions of liability (misconduct here). Instead, public policy dictates that such action should be encouraged.

It seems to me that the majority opinion, even though no inference of admission of misconduct is per se drawn from the retractive steps, nevertheless cannot but tend to discourage others from attempting to set their own houses in order. The alternative obviously is a vigorous litigative defense.

For these reasons I think the district court's conclusion is correct "that by reason of the plaintiff's formal abandonment of the reissue claims, any illegality in connection with the prosecution of the reissue applications does not, as a matter of law, make the original patent [claims] invalid." Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 306 F. Supp. 189, 197 (E.D.Wis.1969).

The majority opinion seems to suggest a fault in the abandonment as being belated in that it only occurred after pretrial discovery. However, there is cause from the record as a whole to believe that plaintiff, and its special trial counsel who had not been previously involved in the matters herein, considering all aspects of the matter including the termination of the employment of the long time house counsel, did act with reasonable promptitude in causing the purging steps to be taken when the pretrial discovery revealed the true state of affairs.

In any event, there is authority that purging steps may be effective at any stage of the proceedings. See, e. g., White Cap Co. v. Owens-Illinois Glass Co., 203 F.2d 694, 698 (6th Cir.), cert. denied, 346 U.S. 876, 74 S.Ct. 128, 98 L.Ed. 384 (1953); cf., Standard Oil Co. v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926 (1931).

"These issues present questions of fact. * * * Whether a purge has been effected under the facts of a given case is largely discretionary with the trial court." Preformed Line Products Co. v. Fanner Mfg. Co., 328 F.2d 265, 279 (6th Cir.), cert. denied, 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51 (1964).

I would find no abuse of discretion here, and on the issues as a whole it seems to me that we are not in a position to hold the findings on which the district court's decision was based to be clearly erroneous. Rule 52(a), Fed.R. Civ.P., G. Leblanc Corp. v. H. & A. Selmer, Inc., 310 F.2d 449, 459 (7th Cir. 1962), cert. denied, 373 U.S. 910, 83 S.Ct. 1299, 10 L.Ed.2d 412 (1963).

Accordingly, I would affirm the judgment of the district court.